JENKINS KAYAYAN LLP
Jonathan M. Jenkins (SBN 193011)
 jjenkins@jklitigators.com
Lara Kayayan (SBN 239384)
 lkayayan@jklitigators.com
444 South Flower St., Suite 1750
Los Angeles, California 90071
(310) 984-6800

*Attorneys for Plaintiff*
*Michael Sanchez*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL SANCHEZ, an individual,<br><br>    Plaintiff,<br><br>    v.<br><br>AMERICAN MEDIA, INC., a Delaware corporation; THE NATIONAL ENQUIRER, INC., a Florida corporation;  DAVID PECKER, an individual; DYLAN HOWARD, an individual; and DOES 1 through 10, inclusive,<br><br>    Defendants. | CASE NO.  2:20-cv-02924<br><br>**COMPLAINT FOR:**<br><br>1. **Defamation (Libel)**<br>2. **Intentional Infliction of Emotional Distress**<br>3. **Conspiracy to Commit Intentional Torts**<br>4. **Aiding and Abetting Commission of Intentional Torts**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Michael Sanchez ("Mr. Sanchez" or "Plaintiff"), by and through his undersigned counsel, complains and alleges against defendants American Media, Inc. ("AMI"), The National Enquirer, Inc. ("TNE"), David Pecker ("Mr. Pecker"), Dylan Howard ("Mr. Howard") and Does 1 through 10 (collectively, "Defendants") as follows:

/ / /

JENKINS KAYAYAN LLP

COMPLAINT

**JENKINS KAYAYAN** LLP

## SUMMARY OF THE ACTION

1. This is the case of a media conglomerate that wanted to deliver a political "payback" to a billionaire owner of a liberal newspaper as a favor for powerful allies, including a high-level conservative U.S. politician and the government of a foreign nation. That favor involved digging up and publishing dirt on the billionaire, who had previously incurred the allies' wrath.

2. Defendants found their dirt – raunchy text messages and pornographic images, including nude selfies, documenting an illicit extramarital affair between the billionaire and Mr. Sanchez's sister, a Los Angeles news reporter and television personality. However, Defendants could not use or publish any of this material because, on information and belief, it had been illegally obtained using high-tech spyware that secretly hacked into the billionaire's iPhone and extracted his most private and confidential information.

3. Thus, Defendants needed another "source" for the billionaire's affair and, conveniently for them, had a long-standing relationship with Mr. Sanchez, a California-based talent manager who managed his sister's career (and already knew about her affair). In or around July of 2018, Defendants contacted Mr. Sanchez via editor Andrea Simpson ("Ms. Simpson") who asked, "what's going on with Lauren and the billionaire?" Defendants clearly knew about his sister's extramarital affair with the billionaire and intended to go public with it.

4. Faced with such a threat to the public image and professional reputation of his sister and client, Mr. Sanchez did what any loyal brother and manager with his particular skill set would have done under the circumstances. First, he leveraged his connections and professional relationships to delay the inevitable story. When it became apparent several months later that public disclosure was imminent, Mr. Sanchez tried to minimize the fallout for his sister by making a deal to cooperate strategically with Defendants in return for control over the story narrative (*i.e.* "love story" versus "sordid extramarital cheating") and timing.

5.      When Defendants eventually published the story three months later, in January of 2019 in *The National Enquirer*, they were unprepared for the wrath of the billionaire, who financed his own sprawling investigation into Defendants' investigative tactics.  Defendants tried to halt the investigation by threatening the billionaire with publication of the previously-referenced pornographic images (which, on information and belief, had been illegally procured).  But instead of acceding to Defendants' extortion, the billionaire took it public: he published the Defendants' written threats of extortion, which ultimately prompted a federal grand jury investigation into Defendants' conduct.

6.      Defendants were already under federal scrutiny – based on a previous political favor that had violated campaign finance laws – and grew desperate to conceal their actual source, or sources, for the pornographic images and decided to scapegoat Mr. Sanchez.  On March 31, 2019, Defendants issued a false and defamatory press release stating that not only was Mr. Sanchez the one who had leaked his own sister's affair to Defendants, but he was also the sole source of all information and materials obtained by Defendants *including nude selfies of the billionaire and other pornographic images involving his sister*.

7.      As described herein, Defendants' false and defamatory statements have, among other things, devastated Mr. Sanchez's professional career and reputation, destroyed the invaluable media relationships that are the "tools" of his trade, and left him estranged from his own family.  Mr. Sanchez now seeks redress from this Court and a jury of his peers.

## THE PARTIES

8.      Plaintiff Michael Sanchez ("Plaintiff" or "Mr. Sanchez") is a citizen of California and resides in Los Angeles County.

9.      Upon information and belief, Plaintiff alleges that defendant American Media, Inc.  ("AMI") is incorporated in Delaware and maintains its principal place of business in New York.  Accordingly, AMI is a citizen of both Delaware and New

JENKINS KAYAYAN LLP

1    York.  AMI is the parent company of defendant The National Enquirer, Inc.

2          10.    Upon information and belief, Plaintiff alleges that defendant The

3    National Enquirer, Inc. ("TNE") is incorporated in Florida and maintains its principal

4    place of business in New York.  Accordingly, TNE is a citizen of both Florida and

5    New York.

6          11.    TNE is a weekly tabloid newspaper published and distributed

7    nationwide, including in California, both in print and online.  On information and

8    belief, California (along with New York and Florida) is one of TNE's three largest

9    markets (in terms of print and online distribution and sales) in the United States.  Upon

10   further information and belief, Plaintiff alleges that, in or around April 2019, AMI

11   contracted to sell TNE, reputedly for a sale price of $100 million, but that transaction

12   has not yet closed.

13         12.    Defendant David Pecker ("Mr. Pecker") is AMI's Chairman and Chief

14   Executive Officer and exercises managerial control over all of TNE's operations.

15   Upon information and belief, Plaintiff alleges that Mr. Pecker is a citizen of

16   Connecticut and maintains his principal residence in the city of Greenwich.

17         13.    Defendant Dylan Howard ("Mr. Howard") is AMI's Vice President and

18   Chief Content Officer and exercises managerial control over all of TNE's operations.

19   Upon information and belief, Plaintiff alleges that Mr. Howard is a citizen of New

20   York and maintains his principal residence in New York City.

21         14.    Plaintiff currently does not know the true names and/or capacities of the

22   defendants sued as Does 1 through 10, inclusive, and therefore sues these defendants

23   by fictitious names. Plaintiff will amend this Complaint to allege the true names and

24   capacities of these defendants when they are ascertained. Each of the fictitiously

25   named Doe defendants are responsible in some manner for the events and happenings

26   alleged in this Complaint.  On information and belief, no Doe defendant is a citizen

27   of California.

28   / / /

-4-
COMPLAINT

JENKINS KAYAYAN LLP

## JURISDICTION AND VENUE

15.   This Court has subject-matter jurisdiction over this action based on the diversity of the parties pursuant to 28 U.S.C. § 1332(a)(1).

16.   The amount in controversy exceeds $75,000 in damages, exclusive of costs, interests, and attorneys' fees, pursuant to 28 U.S.C. § 1332(a).

17.   In addition, jurisdiction is proper because, *inter alia*, Defendants' defamatory statements and other intentionally tortious conduct alleged herein both arose from Defendants' California-related conduct and was intended to and did cause injury to Plaintiff in Los Angeles County, California, where Plaintiff resides. Furthermore, Defendants have all purposefully availed themselves of the benefits and protections of California by, among other things, selling and soliciting sales of tabloid newspapers in California, actively engaging in reporting activities in California pertaining to events in California, publishing print and digital articles directed at residents of California, and communicating and negotiating with Plaintiff in California via email, text message, and in person, as further alleged herein.

18.   This Court is a proper venue for this lawsuit under the provisions of 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

### Plaintiff's Sister and Billionaire Jeffrey Bezos Select Plaintiff to Serve as Their Media Relations Consultant

19.   Mr. Sanchez is the owner and Chief Executive Officer of Axis Management, a successful, Hollywood-based talent management and film and television production firm.   His work often includes arranging, optimizing, and occasionally suppressing media coverage of his high-profile clients.

20.   Accordingly, Mr. Sanchez fostered close relationships with reporters and executive management at numerous media outlets – including defendants Mr. Pecker and Mr. Howard, who effectively manage and control AMI's and THI's media

-5-
COMPLAINT

operations.  In fact, prior to 2018, Mr. Sanchez has made numerous media deals with AMI and TNE on his clients' behalf, all without a penny ever changing hands, often in person and in Los Angeles, with both Mr. Howard (who previously worked and resided in California and frequently returns to this state for AMI media events and kickoff parties) and Ms. Simpson, AMI/TNE's California-based reporter.

21.     One of Mr. Sanchez's clients was his own sister, Wendy Lauren Sanchez ("Ms. Sanchez"), an Emmy Award-nominated American news anchor, entertainment reporter, actress, pilot, and producer.  Ms. Sanchez resides in Beverly Hills and Mr. Sanchez has been his sister's manager and most trusted confidant for most of her professional career.  For instance, in January 2010, Ms. Sanchez contracted with Mr. Sanchez to serve as her sole and exclusive personal manager, representative, and advisor in all entertainment industry matters.  In addition to facilitating the growth of Ms. Sanchez's career, Mr. Sanchez also attempted to optimize his sister's portrayal in the media, occasionally using his skill, experience, and media relationships to "kill" media stories that cast her in an unflattering light and to eliminate rivals competing for Ms. Sanchez's career opportunities, including ABC TV's *The View*.

22.     Accordingly, Mr. Sanchez has been privy to and entrusted with virtually all of Ms. Sanchez's business and often complicated personal affairs.  He was his sister's primary confidant and advisor when, starting in March 2018, Ms. Sanchez revealed that she began an extramarital affair with billionaire Jeffrey Preston Bezos ("Mr. Bezos") in December 2017 – after her production company began working for one of Mr. Bezos's companies, Blue Origin, LLC.

23.     Ms. Sanchez was forthcoming to her brother about her affair, including its origin, and introduced Mr. Sanchez to Mr. Bezos – as her brother, manager, and most trusted advisor – over dinner at a Los Angeles restaurant on or about April 20, 2018.  Mr. Sanchez and Mr. Bezos hit it off immediately and Mr. Bezos was impressed with Mr. Sanchez's media savvy, expertise, and discretion.  Ms. Sanchez

told Mr. Sanchez that Mr. Bezos "loves you" and the siblings began planning for the couple's family communications, divorce process (as Ms. Sanchez and Mr. Bezos were both still married to other people at the time), re-negotiation of a prior, aborted 2016 divorce settlement, strategic management of the inevitable media scandal, current and future business opportunities, and a relatively quick marriage for Ms. Sanchez and Mr. Bezos.

24.     In fact, Ms. Sanchez and Mr. Bezos quickly recognized that Mr. Sanchez was uniquely qualified to fulfill a much-needed role as the couple's independent media consultant.  Mr. Bezos, as the founder and Chief Executive Officer of publicly-traded Amazon.com and the owner of *The Washington Post* (the "Post"), had considerable media advisory resources at his disposal.  However, he obviously could not utilize such corporate resources in connection with his personal extramarital affair.

25.     Mr. Sanchez, however, had both the requisite skill set to keep his sister's and Mr. Bezos's extramarital affair out of the media spotlight until they had told their spouses and families and were ready to go public.  Mr. Sanchez also had a sincere motive for doing so: his love for his sister, her children, and a desire to protect Ms. Sanchez's reputation and career at all costs.  Mr. Sanchez stepped up to the role and became the couple's trusted media consultant, writing and sharing a "PR Roadmap" which included the statement Mr. Bezos eventually instructed Amazon PR to release on January 9, 2019 ("Jeff remains focused on and engaged in all aspects of Amazon"),[1] and advising the couple on best practices for maintaining their relationship's secrecy – for instance, avoiding being seen alone together publicly, avoiding any physical or intimate contact in public, and replacing the shrubs around

JENKINS KAYAYAN LLP

---

[1] https://www.foxbusiness.com/business-leaders/amazon-ceo-jeff-bezos-focused-on-all-aspects-of-company-despite-divorce (last visited March 19, 2020).

1  Ms. Sanchez's all-glass second home in Santa Monica with 15-foot hedges to prevent
2  the couple from being seen together from the outside.

3    26.    Until the time his sister's affair with Mr. Bezos was publicly revealed,
4  Mr. Sanchez was instrumental in guarding its confidentiality.

5  **Defendants Plot to Publish Derogatory Pieces About Mr. Bezos to Curry**
6  **Political Favor with President Donald Trump and the Saudi Arabian**
7  **Government**

8    27.    Mr. Bezos, as the Post's owner, had made enemies out of two of
9  Defendants' most powerful allies: President Donald J. Trump ("Mr. Trump" or
10 "President Trump") and the Crown Prince of Saudi Arabia, Mohammed bin Salman
11 ("MbS").   As will be discussed, the ensuing events would ultimately provide
12 Defendants with powerful, self-interested motives to defame Mr. Sanchez.

13   28.    The Post has published a number of articles highly critical of President
14 Trump, his policies, and his character.  As evidenced by a series of inflammatory
15 Twitter posts, President Trump has taken great offense to those articles and blamed
16 Mr. Bezos personally for the Post's proliferation of allegedly "fake" news.

17   29.    Defendants' support and devotion for President Trump is well-
18 documented in the public record – and particularly by Defendants' commission of
19 campaign finance violations to assist Mr. Trump's presidential candidacy.
20 Specifically, in August 2016, just months before the presidential election, Defendants
21 worked in concert with Mr. Trump's campaign to silence a former Playboy model
22 who claimed to have had a sexual affair with Mr. Trump.  This "catch and kill"
23 operation involved Defendants paying $150,000 for exclusive rights to the model's
24 story – and then suppressing the story to prevent it from influencing the election.

25   30.    Defendants' conduct came to light in 2018 when Trump's former
26 personal attorney, Michael Cohen ("Mr. Cohen"), testified about his own role in the
27 scheme (for which he was subsequently imprisoned).  Ultimately, Defendants avoided
28 prosecution by confessing their crimes and entering into a "Non-Prosecution

JENKINS KAYAYAN LLP

-8-
COMPLAINT

Agreement" ("NPA") with the U.S. Attorney for the Southern District of New York, dated September 20, 2018.[2]

31.    However, the NPA came with a number of conditions, the most important of which, for purposes of this action, was that the NPA was voided (subjecting Defendants to prosecution for the campaign finance crimes to which they had already confessed) should they "commit any crimes subsequent to the date of signing of this Agreement…"

32.    Simultaneously, Defendants were in close contact with – and eager to please – MbS and their Saudi Arabian allies, in hopes of expanding AMI's media empire into the Saudi kingdom.  For instance, on information and belief, in September 2017, Mr. Pecker travelled to Riyadh, the Saudi Arabian capitol, where he met personally with MbS.  Several months later, AMI published a special issue of *The National Enquirer* called "The New Kingdom" ("TNK"): 97 glossy pages of lavish praise and favorable coverage of Saudi Arabia and its controversial leader, MbS.  TNK purported to be "advertisement free," raising questions as to how AMI had funded the 200,000 copy print run.

33.    Curiously, TNK hit newspaper shelves in March 2018, just in time for MbS's maiden tour of the United States as the Saudi Crown Prince (during which MbS and Mr. Pecker held another personal meeting in New York City).  While Defendants initially denied that Saudi Arabia had in any way paid for or contributed to TNK, on information and belief, approximately three weeks prior to publication, a draft of TNK was widely circulated internally among Saudi officials.

34.    On information and belief, in early 2019, federal prosecutors in the Southern District of New York began investigating TNK's publication and whether Defendants had engaged in unlawful influence peddling on behalf of a foreign power.

---

[2] https://www.justice.gov/usao-sdny/press-release/file/1119501/download (last visited March 13, 2020).

JENKINS KAYAYAN LLP

35.    While Defendants were wooing the Saudi Arabian government, Mr. Bezos, on the other hand, was incurring its wrath.  Beginning on or about September 18, 2017, Post columnist and Saudi Arabian dissident Jamal Khashoggi ("Mr. Khashoggi") began authoring regular columns highly critical of the brutal and oppressive Saudi Arabian regime, which MbS found extremely offensive (Mr. Khashoggi was ultimately murdered by Saudi Arabian operatives at the Saudi embassy in Turkey on October 2, 2018).

36.    On information and belief, MbS and the Saudi Arabian government set out to infect Mr. Bezos's Apple iPhone X with sophisticated malware that gave the Saudis virtually unrestricted access to its contents.  On May 1, 2018, MbS personally texted Mr. Bezos a 4.22 MB MP4 video clip via WhatsApp.  On information and belief, secretly embedded in that message was highly sophisticated spyware, known as "Pegasus-3," that the Saudi Royal Guard had recently purchased from NSO Group, an Israeli company, for approximately $55 million.

37.    Mr. Bezos's head of security, Gavin de Becker ("Mr. de Becker"), subsequently commissioned FTI Consulting ("FTI") to perform a forensic cybersecurity analysis of Mr. Bezos's iPhone.  FTI's report, dated November 2019 (the "FTI Report"), concluded that, within hours of receiving the WhatsApp text from MbS, cellular data emissions from Mr. Bezos's iPhone spiked to 126 MB per day (an increase of 29,000%); the unauthorized cellular data emissions continued for months afterwards, at times reaching rates as high as 4.6 GB per day[3] – transfer rates high enough to extract every bit of data stored on Mr. Bezos's cell phone.

38.    In January 2020, the United Nations Human Rights Commission, citing the FTI Report, demanded an investigation into mounting evidence that Saudi Arabia and MbS were engaged in the systematic and "unaccountable use of spyware to

---

[3]  https://www.documentcloud.org/documents/6668313-FTI-Report-into-Jeff-Bezos-Phone-Hack.html - document/p1 (last visited March 13, 2020).

intimate journalists, human rights defenders, and owners of media outlets."[4]

39.     On information and belief, from May 1, 2018 until at least February 17, 2019 (virtually the entire time period relevant to this action), the Saudis retained clandestine and unfettered access to the contents of Mr. Bezos's iPhone, including all of his photographs and communications – such as Mr. Bezos's intimate and occasionally pornographic text message exchanges with Ms. Sanchez.   On information and belief, in November 2018 and February 2019, MbS sent Mr. Bezos additional WhatsApp messages in which he "revealed private and confidential information about Mr. Bezos's personal life that was not available from public sources" – including apparent knowledge of Mr. Bezos's affair with Ms. Sanchez.[5]

40.     On information and belief, in 2018 Defendants plotted to dig up embarrassing information about Mr. Bezos's personal life for use in a TNE "hit piece" against Mr. Bezos.   Doing so would kill two birds with one stone by garnering Defendants favor with both President Trump and Saudi Arabia.

41.     On further information and belief, Defendants received assistance toward this end from Saudi Arabia and MbS, who illegally hacked Mr. Bezos's cellular phone as previously described.

**The Extramarital Affair Between Mr. Bezos and Ms. Sanchez Is Exposed and Plaintiff Attempts to Control the Media Narrative**

42.     Despite Mr. Sanchez's best efforts to keep Mr. Bezos's and Ms. Sanchez's affair under wraps, observant journalists soon began asking hard questions. For instance, on July 18, 2018, Ms. Sanchez was photographed standing unprofessionally close to Mr. Bezos on the VIP platform following a successful launch of a Blue Origins rocket in West Texas.

---

[4]https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=25488&LangID=E (last visited March 13, 2020).

[5] *Id.*

JENKINS KAYAYAN LLP

43.     Shortly afterwards, Ms. Simpson called Mr. Sanchez and unintentionally revealed that AMI and TNE were looking into his sister's affair.  On information and belief, Defendants were already in possession of raunchy text messages and nude selfies exchanged between Ms. Sanchez and Mr. Bezos.  Also in July 2018, Mr. Sanchez agreed to meet with Simpson, AMI/TNE's Los Angeles-based editor.  Using the cover of "a friend of a client who works for a Bill Gates-type billionaire is interested in selling a story about the billionaire's extramarital affair with a B-list actress," Mr. Sanchez confirmed Defendants had the story about his sister and Mr. Bezos and was able to deflect Defendants' investigation and slow the public emergence of the affair.

44.     In October 2018, recognizing that public disclosure was likely inevitable, Ms. Sanchez approached Mr. Sanchez about leaking her affair with Mr. Bezos to the press, specifically to her long-term friends Harvey Levin and Charles Latibeaudiere at tabloid powerhouse *TMZ*.  Mr. Sanchez advised his sister not to do so until she and Mr. Bezos had informed their respective spouses and children.

45.     However, it was later revealed that a trusted employee of Ms. Sanchez, working on her "glam squad" inside her home, also happened to be close friends with Ms. Simpson and has been leaking stories about Ms. Sanchez to AMI for years.

46.     In late October 2018, Mr. Sanchez elected to get ahead of the story to tactically limit the backlash against his sister and Mr. Bezos, as he had done for Ms. Sanchez and other clients multiple times in the past.  To protect his sister and Mr. Bezos, Mr. Sanchez entered into a confidential deal to cooperate strategically with Defendants. Mr. Sanchez agreed to confirm the existence of the affair and provide a face-to-face viewing of corroborating evidence, including a few text messages and non-pornographic photographs shared by Ms. Sanchez – but only under conditions that would give him some control over the timing of the story and the manner in which the affair was portrayed in TNE, *Us Weekly*, and other AMI publications, as well as to shape and soften the story during the drafting process.

JENKINS KAYAYAN LLP

47.     Accordingly, between at least October 2018 and March 2019, Mr. Sanchez, while in California, discussed Ms. Sanchez's affair with Defendants (including, but not limited to, Mr. Howard, AMI News Director James Robertson ("Mr. Robertson") and Ms. Simpson, AMI's California-based editor) via dozens of emails, text messages, and telephone calls.

48.     In a contract dated January 1, 2019, in anticipation of the pending public disclosure of her affair, Ms. Sanchez retained Plaintiff to provide crisis management, strategic communications, public and media relations services.  Mr. Sanchez also provided Mr. Bezos with talking points for public appearances related to the matter.

49.     On January 7, 2019, Mr. Howard sent Mr. Bezos a "request for comment" email seeking comment regarding certain intimate details about their affair (Mr. Robertson sent an identical request for comment email to Ms. Sanchez).  Mr. Bezos and Ms. Sanchez requested that Mr. Sanchez respond on their behalf, so Mr. Howard then forwarded the detailed 44-point request for comment to Mr. Sanchez.

50.     Mr. Sanchez noted that the request for comment included certain  false allegations, mistakes, and assertions that Mr. Sanchez *had never provided to or discussed with Defendants*, such as: (a) "Mr. Bezos met Ms. Sanchez at a 'Manchester By The Sea' party in December 2016" where Mr. Bezos told Ms. Sanchez, "You can't fight chemistry"; (b) "Mr. Bezos sent Ms. Sanchez a photograph of his penis"; (c) "Mr. Bezos has been buying gifts for Ms. Sanchez"; (d) "Ms. Sanchez' husband and Mr. Bezos' wife are not aware of the romantic relationship between Mr. Bezos and Ms. Sanchez"; (e) "Mr. Bezos has a paternal aunt, Kathy Jorgensen, that he has not seen since Mr. Bezos was two years old"; (f) "Mr. Bezos' late birth father, Ted Jorgenson, once wrote to Mr. Bezos.  Mr. Bezos answered Mr. Jorgensen's letter but has not otherwise been in touch with Mr. Jorgensen's family"; and (g) specific details about hotels, private plane tracking, etc., of which Mr. Sanchez was not aware.  Thus, the request for comment confirmed that Defendants had received information and materials about the affair *from sources other than Plaintiff*.

51.   The request for comment made clear that Defendants' public revelation of the Bezos/Sanchez affair was imminent.  Accordingly, Mr. Bezos and Ms. Sanchez took steps to fully inform their respective spouses about their affair.

52.   On or about January 9, 2019, Mr. Bezos and his then-wife, MacKenzie Tuttle ("Ms. Tuttle"), published an announcement on Mr. Bezos's Twitter account that they were separating.

53.   Also on or about January 9, 2019, Ms. Sanchez told her then-husband, Patrick Whitesell ("Mr. Whitesell"), more of the truth about her affair with Mr. Bezos, as well as selected items from the request for comment that Mr. Howard had sent her two days earlier.  On information and belief, Mr. Whitesell promptly leaked the affair and comment call details to Emily Smith of *Page Six*, unbeknownst to Ms. Sanchez.

54.   Later that same day, the extramarital affair between Ms. Sanchez and Mr. Bezos was publicized by TNE[6] and *Page Six*.[7]  TNE's online article included a reference to a "steamy picture too explicit to print here" and the print version (also partially available online),[8] published on or about January 14, 2019, included intimate photographs and "recreations" of explicit text messages that Mr. Bezos had sent to Ms. Sanchez during the affair.  The TNE articles included content and material not given to Defendants by Mr. Sanchez but which, on information and belief, was provided by one or more of Defendants' other sources.

/ / /

---

[6]   https://www.nationalenquirer.com/videos/jeff-bezos-divorce-lauren-sanchez-cheating-affair-photos-exclusive/ (last visited March 17, 2020).

[7]   https://pagesix.com/2019/01/09/jeff-bezos-has-been-seeing-former-tv-anchor-lauren-sanchez/ (last visited March 17, 2020).

[8]   https://www.nationalenquirer.com/photos/amazon-boss-jeff-bezos-affair-lauren-sanchez-exposed/ (last visited March 17, 2020).

JENKINS KAYAYAN LLP

**<u>Defendants Intentionally Defame Plaintiff – By Falsely Identifying Him as the</u>**
**<u>Source of Graphic Pornographic Images – After Defendants' Attempted</u>**
**<u>Extortion of Mr. Bezos Backfires</u>**

55.   In response to the TNE articles, Mr. Bezos enlisted Mr. de Becker, his head of security, and his company, Gavin de Becker and Associates, to mount a full-throated investigation into: (a) the identity of Defendants' sources for all of the content and material published by TNE; and (b) whether TNE's article has been politically motivated, given Defendants' well-known alliances with President Donald Trump and the Saudi Arabian government.

56.   Defendants, particularly Mr. Pecker, reportedly became apoplectic about Mr. Bezos's counter-investigation and seemed especially concerned by the suggestion of Saudi involvement.  On information and belief, in early February 2019, Defendants told Mr. Bezos – first orally and then in writing – that they had obtained additional intimate text messages between him and Ms. Sanchez, as well as graphic pornographic photos of them (including a "below the belt selfie" or "d*ck pic" that Mr. Bezos allegedly sent Ms. Sanchez).   On information and belief, Defendants threatened to publish such materials unless Mr. Bezos ordered Mr. de Becker to stand down and stop his investigation.

57.   Rather than submit to Defendants' extortion efforts, Mr. Bezos instead publicly aired them in a medium.com post dated February 7, 2019 entitled "No Thank You, Mr. Pecker."[9]  There, Mr. Bezos revealed email communications in which Mr. Howard identified, in addition to the previously-referenced "d*ck pic," nine additional photographs of Mr. Bezos and/or Ms. Sanchez – many of which were described in pornographic or quasi-pornographic terms (collectively, the "Pornographic Materials").   Mr. Howard threatened that TNE would publish the

---

[9]   https://medium.com/@jeffreypbezos/no-thank-you-mr-pecker-146e3922310f (last visited March 17, 20120).

JENKINS KAYAYAN LLP

Pornographic Materials unless Mr. Bezos and Mr. de Becker signed a settlement agreement and issued public statements affirming that they had no information that Defendants' coverage of Mr. Bezos' affair "was politically motivated or influenced by political forces."[10]

58.     On information and belief, prosecutors in the Southern District of New York commenced an investigation into whether Defendants had, *inter alia*, committed criminal extortion (18 U.S.C. 875(d)) against Mr. Bezos.  A grand jury was convened.

59.     This was doubly problematic for Defendants: if they were found to have committed extortion or obtained any Pornographic Materials through unlawful methods (such through the electronic hacking of Mr. Bezos's phone by Saudi Arabia), then in addition to facing prosecution for those crimes, the NPA would be rescinded, subjecting Defendants to prosecution for their earlier campaign finance crimes, discussed previously.  Accordingly, on information and belief, in an effort to reduce their potential criminal exposure, Defendants conspired to promote a false and defamatory "single-source" theory, under which they agreed to publicly state that Plaintiff had been the one and only source for all of the information and materials Defendants had obtained in connection with their investigation and reporting on the Bezos/Sanchez affair – including the Pornographic Materials.

60.     On Saturday, March 30, 2019, Mr. de Becker wrote a column in *The Daily Beast* revealing that Defendants' extortion of Mr. Bezos had included another, previously unreported component: Defendants had also demanded that Mr. de Becker issue a public statement that his investigation had concluded that Defendants had not relied on "any form of electronic eavesdropping or hacking in their news-gathering process."[11]  Mr. de Becker revealed that, in actuality, he believed that:

_____

[10] *Id.*

[11]   https://www.thedailybeast.com/jeff-bezos-investigation-finds-the-saudis-obtained-his-private-information?ref=home (last visited March 17, 2020).

JENKINS KAYAYAN LLP

- Defendants had relied on one or more sources *other than* Mr. Sanchez in connection with TNE's investigation of the Bezos/Sanchez affair and the procurement of "embarrassing photos" of Mr. Bezos (aka the Pornographic Materials);
- Saudi Arabia was likely one of Defendants' other sources; and
- Saudi Arabia had hacked Mr. Bezos's phone and gained access to Mr. Bezos's private information (as subsequently confirmed by the FTI Report).[12]

61.     The next day, Sunday, March 31, 2019, Defendants rushed to issue a defamatory responsive "statement" to the press promoting their demonstrably false claim that Mr. Sanchez was the "single-source" for all of Defendants' investigations (including the Pornographic Materials).  On information and belief, Defendants knew that the following statement would be picked up and quoted verbatim by numerous media outlets:

> Despite the false and unsubstantiated claims of Mr. de Becker, American Media has, and continues to, refute the unsubstantiated claims that the materials for our report were acquired with the help of anyone other than the single source who first brought them to us. The fact of the matter is, ***it was Michael Sanchez who tipped the National Enquirer off to the affair on Sept. 10, 2018, and over the course of four months provided all of the materials for our investigation***. His continued efforts to discuss and ***falsely represent our reporting***, and ***his role in it***, has waived any ***source confidentiality***. ***There was no involvement by any other third party whatsoever*** (emphasis added).[13]

62.     Defendants' press statement was intentionally false and defamatory in at least three ways.

---

[12]  *Id.*

[13]  https://www.thedailybeast.com/national-enquirer-says-saudis-didnt-help-on-bezos-story (last visited March 17, 2020).

JENKINS KAYAYAN LLP

63.   *First*, Mr. Sanchez did not "tip [TNE] off to the affair on Sept. 10, 2018…"   Mr. Sanchez did not leak his own sister's affair with Mr. Bezos to Defendants.   Rather, as previously discussed, it was *Defendants* who first contacted Mr. Sanchez about the affair in July 2018, at which time Mr. Sanchez sought to delay and soften the inevitable public disclosure of the affair.

64.   In fact, Mr. Howard admitted in a January 22, 2019 email to Plaintiff (the "Jan. 22 Howard Email") that Defendants had first uncovered the Bezos/Sanchez affair from another source entirely:

> The untold story – if you will – has not been told as to how we uncovered the story.  I'm saving it for my tombstone.

It is understandable, given the NPA's prohibition on future criminal acts, that Mr. Howard would not want the initial source (which, on information and belief, was Saudi Arabia's illegal hacking of Mr. Bezos's iPhone) revealed during his lifetime.

65.   Mr. Howard also alluded to an undisclosed source other than Mr. Sanchez in a widely-published *Columbia Journalism Review* article, which quoted him as stating:

> I'll talk about *Be*-zos as much as I fucking want, and I can give you the real fucking story… I have audiotapes, kay?... I have audiotapes.

In the article, respected journalist Simon van Zuylen-Wood was stunned by Mr. Howard's brazen boast, writing, "Was Howard planning to bring down the world's richest man–again!– by leaking me a Bezos hot mic? With the *Enquirer*, you never really know."[14]

66.   *Second*, Defendants' statement about Mr. Sanchez's "continued efforts"

---

[14] https://www.cjr.org/special_report/national-enquirer.php (last visited March 19, 2020).

JENKINS KAYAYAN LLP

to "falsely represent our reporting, and his role in it…" was an obvious reference to Mr. Sanchez's previous and public denials – in response to third-party speculation and insinuation – that Plaintiff had provided Defendants with Pornographic Materials. Plaintiff did not provide Defendants with Pornographic Materials (some of which purportedly depicted his own sister) and his denials were true.   Accordingly, Defendants' statement that Plaintiff's *true* denials were *false* constituted deliberate and intentional defamation.

67.   *Third*, Defendants' statement that Mr. Sanchez "provided all the materials for our investigation" and "[t]here was no involvement by any third party whatsoever" directly implicated Mr. Sanchez as the "single source" who provided Defendants with the Pornographic Materials.   However, Plaintiff did not provide Defendants with the Pornographic Materials (some of which purportedly depicted his own sister) or many of the other materials included in TNE stories about the affair. Accordingly, Defendants' contrary statement constituted deliberate and intentional defamation.

68.   It has been conclusively established that Plaintiff was not and could not have been the source of the Pornographic Materials because he never possessed them. In April 2019, FBI agents served Mr. Sanchez with a subpoena to appear before the federal grand jury convened to investigate Defendants. Mr. Sanchez provided sworn testimony one month later.   All of his computers and electronic devices were subjected to a comprehensive forensic search and audit.  The FBI correctly concluded – as did Mr. de Becker's own investigators – that Mr. Sanchez had never been in possession of the Pornographic Materials.

69.   Mr. Sanchez does not contend he is a public figure.   Nonetheless, Defendants' defamatory statements were made intentionally, deliberately, and with actual malice.  This is evident through multiple factors, including, *inter alia*, the following:

JENKINS KAYAYAN LLP

- Defendants obviously and uniquely knew who their own sources were and which sources provided which information and materials; therefore, Defendants know full well (and conceded in the Jan. 22 Howard Email) that Plaintiff was not their "sole source" and did not provide the Pornographic Materials.

- Defendants should not have even mentioned Mr. Sanchez as a *source in any capacity*, as they had promised him "source confidentiality," as is a sacred custom in the media industry.

- Defendants' motive for scapegoating Plaintiff was selfish and vile: to obstruct the federal investigation and media inquiries into Defendants' attempted extortion of Mr. Bezos by concealing the true initial source regarding the Bezos/Sanchez affair and the source of the Pornographic Materials (which, on information and belief, was Saudi Arabia's illegal hacking of Mr. Bezos's iPhone).

- In addition, revealing the use of illegal sources would have invalidated the NPA, subjecting Defendants to prosecution for prior campaign finance crimes.

70.     Defendants' defamatory statements have significantly harmed Mr. Sanchez economically and emotionally.  Many of his long-time clients have stopped working with him, film and television production deals were destroyed, and the media contacts he relied upon to perform his job – relationships that Plaintiff spent decades or more developing – no longer return his calls or wish to associate with him. Defendants' defamatory statements have irreparably damaged Plaintiff's business reputation, destroyed his ability to earn a living, and estranged him from his own family.

/ / /

JENKINS KAYAYAN LLP

### FIRST CAUSE OF ACTION
### Defamation - Libel
### (Against All Defendants)

71.     Mr. Sanchez realleges and incorporates by reference the preceding paragraphs as if set forth in full herein.

72.     As alleged herein, March 31, 2019, Defendants released a press statement, knowing and intending that it would be reported in and quoted by multiple media outlets, that contained false defamatory statements and/or statements reasonably susceptible of a defamatory meaning, including, *inter alia*, that Plaintiff had leaked his own sister's extramarital affair to Defendants and supplied Defendants with Pornographic Materials depicting her.

73.     At the time they released the press statement on March 31, 2019, Defendants acted with negligence and with actual malice and knew that their statements therein regarding Plaintiff were false, made with reckless disregard of the truth, or made without using reasonable care to determine the truth or falsity of their statements.

74.     Defendants' release and publication of the false and defamatory press statement was not privileged.

75.     As a direct and proximate result of Defendants' misconduct alleged herein, Plaintiff has suffered general and special damages in an amount to be determined at trial but in no event less than the minimum threshold for diversity jurisdiction, including, without limitation, damage to Plaintiff's reputation, career, and standing in the community.

76.     On information and belief, Defendants' actions described herein were done with oppression, fraud or malice, entitling Plaintiff to punitive damages in an amount sufficient to punish Defendants and deter them and others similarly situated from such conduct in the future.

**SECOND CAUSE OF ACTION:**

**Intentional Infliction of Emotional Distress**

**(Against All Defendants)**

77.     Mr. Sanchez realleges and incorporates by reference the preceding paragraphs as if set forth in full herein.

78.     Defendants' conduct described herein, including defaming and scapegoating Plaintiff in an effort to conceal Defendants' actual source of the Pornographic Materials (which, on information and belief, was Saudi Arabia's illegal hacking of Mr. Bezos's iPhone) from federal investigators, knowing full well that such actions would cause Plaintiff to be alienated from his family, professional colleagues, and the world at large, was extreme and outrageous and exceeded the bounds tolerated in a civilized society.

79.     As a direct and proximate result of Defendants' conduct described herein, Plaintiff has suffered severe emotional and mental distress in an amount to be determined at trial but in no event less than the minimum threshold for diversity jurisdiction.  Such emotional distress is manifested by physical symptoms, including but not limited to insomnia, anxiety, loss of appetite, and nausea.

80.     On information and belief, Defendants' actions described herein were done with oppression, fraud or malice, entitling Plaintiff to punitive damages in an amount sufficient to punish Defendants and deter them and others similarly situated from such conduct in the future.

**THIRD CAUSE OF ACTION:**

**Conspiracy to Commit Intentional Torts**

**(Against All Defendants)**

81.     Mr. Sanchez realleges and incorporates by reference the preceding paragraphs as if set forth in full herein.

82.     As set forth herein, Plaintiff is informed and believes that, Defendants, and each of them, acting jointly and for their individual benefit, either expressly

JENKINS KAYAYAN LLP

and/or by tacitly agreed to commit the acts alleged herein, and at all times had knowledge of, joined in the formation of, and participated in a conspiracy with each other to defame Plaintiff and scapegoat him in an effort to conceal Defendants' actual source of the Pornographic Materials (which, on information and belief, was Saudi Arabia's illegal hacking of Mr. Bezos's iPhone) from federal investigators, and that said acts and omissions were committed in furtherance of said conspiracy, resulting in damages to Plaintiff.

83.     Plaintiff is further informed and believes that, as alleged herein, one or more of the Defendants committed acts in furtherance of the intent and purpose of their agreement and conspiracy.

84.     As a direct and proximate result of Defendants' conduct described herein, Plaintiff has suffered special and general damages in an amount to be determined at trial but in no event less than the minimum threshold for diversity jurisdiction.

85.      On information and belief, Defendants' actions described herein were done with oppression, fraud or malice, entitling Plaintiff to punitive damages in an amount sufficient to punish Defendants and deter them and others similarly situated from such conduct in the future.

### FOURTH CAUSE OF ACTION:

### Aiding and Abetting Commission of Intentional Torts

### (Against All Defendants)

86.     Mr. Sanchez realleges and incorporates by reference the preceding paragraphs as if set forth in full herein.

87.     As alleged herein and on information and belief, Defendants, and each of them, had knowledge of the illegal and wrongful conduct alleged herein, including the defamation of Plaintiff and the scapegoating of him in an effort to conceal Defendants' actual source of the Pornographic Materials (which, on information and belief, was Saudi Arabia's illegal hacking of Mr. Bezos's iPhone) from federal

JENKINS KAYAYAN LLP

investigators, and each of Defendants' actions was intended to and did substantially assist the primary wrong and was a substantial factor in causing harm to Plaintiff.

88.   As a direct and proximate result of Defendants' conduct described herein, Plaintiff has suffered special and general damages in an amount to be determined at trial but in no event less than the minimum threshold for diversity jurisdiction.

89.   On information and belief, Defendants' actions described herein were done with oppression, fraud or malice, entitling Plaintiff to punitive damages in an amount sufficient to punish Defendants and deter them and others similarly situated from such conduct in the future.

## **PRAYER FOR RELIEF**

WHEREFORE, Michael Sanchez prays for judgment as follows:

(a)   For general, compensatory, reputational, and special damages, including contractual expectation damages;

(b)   For declaratory relief whereby Defendants are ordered to correct their defamatory statements;

(c)   For prejudgment interest at the maximum legal rate;

(d)   For an award of attorneys' fees, costs, and expenses incurred herein;

(e)   For punitive damages in an amount according to proof; and

(f)   For such other and further relief as the Court deems just and proper.

Dated: March 27, 2020                    Respectfully submitted,


JENKINS KAYAYAN LLP


By:  /s/ Jonathan M. Jenkins

Jonathan M. Jenkins
*Attorneys for Plaintiff*

## **DEMAND FOR JURY TRIAL**

Plaintiff Michael Sanchez hereby demands a trial by jury in the above action.

Dated: March 27, 2020

Respectfully submitted,

JENKINS KAYAYAN LLP


By:   /s/ Jonathan M. Jenkins

Jonathan M. Jenkins
*Attorneys for Plaintiff*

JENKINS KAYAYAN LLP