4-UNREDACTED Exhibit 10 to
Supp. Jenkins Dec. ISO Supp.
Opposition [Doc. 47-10]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION - LOS ANGELES

```
_____ )
MICHAEL SANCHEZ, an               )
individual,                       )
                                  )
        Plaintiff,                )
                                  )
        vs.                       ) CASE NO.
                                  ) 2:20-cv-02924-DMG (PVCx)
AMERICAN MEDIA, INC., a           )
Delaware corporation;             )
DAVID PECKER, an individual;      )
DYLAN HOWARD, an individual;      )
and DOES 1 through 10,            )
inclusive,                        )
                                  )
        Defendants.               )
_____)
```

ZOOM DEPOSITION OF JAMES ROBERTSON

NEW YORK, NEW YORK

FRIDAY, MARCH 26, 2021

Reported by:

Kyung Lee-Green, CSR No. 12655, CLR

Job No. 59165

JAMES ROBERTSON

March 26, 2021

```
 1                  UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3                 WESTERN DIVISION - LOS ANGELES

 4    _____)
                                         )
 5    MICHAEL SANCHEZ, an                )
      individual,                        )
 6                                       )
           Plaintiff,                    )
 7                                       )
           vs.                           ) CASE NO.
 8                                       ) 2:20-cv-02924-DMG (PVCx)
      AMERICAN MEDIA, INC., a            )
 9    Delaware corporation;              )
      DAVID PECKER, an individual;       )
10    DYLAN HOWARD, an individual;       )
      and DOES 1 through 10,             )
11    inclusive,                         )
                                         )
12           Defendants.                 )
      _____)
13

14

15            Deposition of JAMES ROBERTSON, located in

16    New York, New York, via Zoom taken on behalf of

17    Plaintiff Michael Sanchez, commencing at 10:08 a.m., and

18    ending at 4:08 p.m., on Friday, March 26, 2021, before

19    KYUNG LEE-GREEN, Certified Shorthand Reporter No. 12655

20    for the State of California, CLR.

21

22

23

24

25
```

JAMES ROBERTSON

```
 1    APPEARANCES OF COUNSEL:

 2

 3         For the Plaintiff MICHAEL SANCHEZ:

 4             JENKINS KAYAYAN LLP
               BY:   JONATHAN M. JENKINS, ESQ.
 5                   JORDAN T. SMITH, ESQ.
               444 South Flower Street
 6             Suite 1750
               Los Angeles, California 90071
 7             (71310)984-6800
               jjenkins@jklitigators.com
 8             jsmith@jklitigators.com

 9

10         For the Defendants:

11             BALLARD SPAHR
               BY:   JAMES A. MITCHELL, ESQ.
12                   ROBERT S. GUTIERREZ, ESQ.
                     BRAD GERSHEL, ESQ.
13             1675 Broadway
               19th Floor
14             New York, New York 10019
               (212)223-0200
15             mitchellj@ballardspahr.com
               gutierrezr@ballardspahr.com
16             gershelb@ballardspahr.com

17

18         Also Present:

19             Nicole Hutchison, Audiovisual Tech

20

21

22

23

24

25
```

```
 1                NEW YORK, NEW YORK, CALIFORNIA;
 2            FRIDAY, MARCH 26, 2021; 10:08 A.M.
 3
 4                    JAMES ROBERTSON,
 5    having been administered an oath to tell the truth, the
 6    whole truth, and nothing but the truth, testified as
 7    follows:
 8
 9                      EXAMINATION
10    BY ATTORNEY JENKINS:
11        Q    Good morning, Mr. Robertson.
12        A    Good morning, Mr. Jenkins.
13        Q    Could you please state and spell your full
14    name.
15        A    Yes.  James Robertson, J-a-m-e-s,
16    R-o-b-e-r-t-s-o-n.
17        Q    Mr. Robertson, have you ever been deposed
18    before?
19        A    No, this is my first time.
20        Q    Okay.  You understand that you are under oath
21    and the testimony you give here today has the same force
22    and effect as it would in a court of law?
23        A    Yes, I do.
24        Q    You understand that you are appearing pursuant
25    to Federal Rule Civil Procedure 30(b)(6) as a person
```

```
 1   knowledgeable with respect to certain matters that we'll
 2   get to in a moment?
 3        A    Yes, I do.
 4        Q    And you understand that with respect to those
 5   matters, you speak for the corporation?
 6        A    Yes, I do.
 7        Q    The corporation being defendant World Media --
 8   Jim, help me out.
 9             ATTORNEY MITCHELL:  World Media Services
10   Group.
11   BY ATTORNEY JENKINS:
12        Q    World Media Services Group, formerly known as
13   American Media, Incorporated?
14        A    Yes.
15        Q    And what is your position at -- well, can we
16   just agree for purposes today that when I say "AMI," I
17   am referring to American Media Group, Incorporated, and
18   its successor in name?
19        A    Yes.
20        Q    And what is your position at AMI?
21        A    My present position is editor-in-chief of
22   "Us Weekly" and "OK Magazine."
23        Q    And what was your position as of late 2018 and
24   early 2019?
25        A    I was the head of news and a senior executive
```

JAMES ROBERTSON

March 26, 2021

```
 1   editor.
 2        Q    And you had involvement with the
 3   "National Enquirer" as well; correct?
 4        A    That's correct.
 5        Q    What involvement did you have with the
 6   "National Enquirer"?
 7        A    In my position of head of news, I was
 8   responsible for overseeing news gathering for the
 9   "National Enquirer."
10        Q    Is there any reason -- illness, intoxication,
11   drug use -- that you can't proceed with the deposition
12   today and give us your best and most accurate testimony?
13        A    No.  You'll have my best and most accurate
14   testimony.
15        Q    Great.
16             Nicole, could we put up document 1, and mark
17   it Exhibit 1.
18             (Exhibit 1 marked.)
19             ATTORNEY JENKINS:  Can -- and, Nicole, could
20   you just scroll through the document so the witness
21   can . . .
22             (Discussion held off the record.)
23             ATTORNEY MITCHELL:  Mr. Jenkins, do you want
24   him to be reading this as we go?  I'm not sure what
25   you're --
```

JAMES ROBERTSON

March 26, 2021

```
1   plainly outside the Judge's 12/29 order.  And also I
2   would tend to disagree with you with respect to the
3   Judge's finding on the complaint and -- and defamation
4   claim.  But we can, again, agree to disagree, and we'll
5   just reserve our rights on that.
6           ATTORNEY JENKINS:  Nicole, could I get
7   document 4.  And let's mark it as Exhibit 2.
8           (Exhibit 2 marked.)
9   BY ATTORNEY JENKINS:
10      Q   Mr. Robertson, these are "Plaintiff's First
11  Set of Interrogatories to Defendant American Media,
12  Inc."
13          Nicole, could we go to the second-to-last
14  page.  The -- actually, let's go back to the first page.
15          And, Mr. Robertson, do you recognize this
16  document?
17      A   Yes, I do.
18      Q   Okay.
19          And this is "Plaintiff's First Set of
20  Interrogatories to Defendant American Media,
21  Incorporated," marked as Exhibit 2.
22          Could we go to the third page with item Q in
23  the middle of the page.
24          Sir, I'm reading from page 2, part Q.
25              "The term 'PORNOGRAPHIC MATERIALS'
```

JAMES ROBERTSON

```
 1              refers to ANY intimate or graphic,
 2              pornographic, or semi-pornographic
 3              photographs of BEZOS or MS. SANCHEZ,
 4              including but not limited to the 'below
 5              the belt selfie' referenced in
 6              Paragraph 60 of the COMPLAINT."
 7          Can we agree that that will be an acceptable
 8  definition to use today when we're referring to
 9  pornographic materials?
10      A   Yes.
11      Q   Okay.  Let's put up Exhibit -- or document 5
12  and mark it as Exhibit 3.
13          (Exhibit 3 marked.)
14          ATTORNEY JENKINS:  And let's go to page 16.
15          Up a little bit more so we can have
16  paragraph 60 in the middle of the screen.
17  BY ATTORNEY JENKINS:
18      Q   Mr. Robertson, I will represent to you that
19  what has been marked as Exhibit 3 is plaintiff
20  Michael Sanchez's First Amended Complaint in this
21  action, and paragraph 60 reads (as read):
22              "In early February 2019,
23          Mr. Howard" -- Dylan Howard -- "informed
24          Mr. Bezos" -- Mr. Jeffrey Preston
25          Bezos -- "first orally and then, on
```

JAMES ROBERTSON

March 26, 2021

1          February 5th, by e-mail -- that

2          Defendants had obtained additional

3          intimate text messages between him and

4          Ms. Sanchez as well as graphic

5          pornographic photos of them (including a

6          'below the belt selfie' or 'dick pic'

7          that Mr. Bezos alleged sent Mr. San" --

8          "Ms. Sanchez)."

9          You see where I'm reading, Mr. Robertson?

10    **A    Yes, I do.**

11    Q    Okay.

12          And, Nicole, could you scroll down to page 62.

13          ATTORNEY MITCHELL:  Page 62 or paragraph 62?

14          ATTORNEY JENKINS:  Paragraph 62, thank you.

15    BY ATTORNEY JENKINS:

16    Q    I'm going to start -- start with the second --

17    well, no.

18          Paragraph 62 reads:

19              "Rather than submit to Defendants'

20          extortion efforts, Mr. Bezos instead

21          publicly aired them in a medium.com post

22          dated February 7, 2019 entitled, 'No

23          Thank You, Mr. Pecker.'"

24          And the first AC then -- the first amended

25    complaint then incorporates the previous definition --

JAMES ROBERTSON

1   or previous materials from page 60 and defines them as

2   pornographic materials.  And there is a footnote -- can

3   we go down to footnote 10, please.

4           Mr. Robertson, you -- you see the hyperlink

5   listed in footnote 10?

**6       A     Yes, I do.**

7       Q     Okay.

8           Nicole, can we have document 6, and let's mark

9   it Exhibit 4.

10          (Exhibit 4 marked.)

11   BY ATTORNEY JENKINS:

12      Q     Mr. Robertson, do you recognize this document,

13   which I'll represent to you is a medium.com -- the

14   medium.com Internet post referenced in the first amended

15   complaint?

16          ATTORNEY MITCHELL:  I -- I'd register an

17   objection.  I'm going to let him answer the question if

18   he recognizes it.  But as I think I've indicated before,

19   we did when we objected, this topic with respect to the

20   February 7, 2019, med -- "medium" blog is not within the

21   scope of the judge's 12/29 order.  But I agree to let

22   it -- we'll -- we'll go step by step, and I will let him

23   answer this question.

**24          THE WITNESS:  Yes, I'm aware of this post.**

25          ATTORNEY JENKINS:  Okay.  Nicole, could we go

JAMES ROBERTSON

```
 1    to page 3.  And under confidential and not distribution,
 2    Mr. Bezos has set forth the text of a letter.  Can we
 3    scroll down a little bit more so we get the signature of
 4    Dylan Howard.
 5              Okay.  And this, Mr. Bezos represents in his
 6    post, is a letter sent to him by Dylan Howard in which
 7    he specifies the items constituting the pornographic
 8    materials at issue.
 9              Can we go up a little bit more, Nicole.
10              And, Mr. Robertson, you see where in the
11    third paragraph it reads:
12                    "In addition to the 'below the belt
13                    selfie -- otherwise colloquially known as
14                    a dick pic" -- The Enquirer obtained a
15                    further nine images.  These include."
16              Do you see where I'm reading, sir?
17         A    Yes, I do.
18         Q    And do you see the -- below that, there are
19    nine purported photographs constituting the pornographic
20    materials?
21         A    Yes, I do.
22         Q    Okay.
23              Where -- we don't have the ability to put
24    multiple documents on the screen at a time, Nicole?
25                    THE AUDIOVISUAL TECHNICIAN:  Yes, but it takes
```

JAMES ROBERTSON

March 26, 2021

```
 1   a second.  So yes.
 2            ATTORNEY JENKINS:  Can we leave that page up
 3   and go to document 3, mark that as Exhibit 5.
 4            (Exhibit 5 marked.)
 5            THE AUDIOVISUAL TECHNICIAN:  Did you want
 6   this -- did you want this side by side?
 7            ATTORNEY JENKINS:  Actually for -- for now,
 8   no.  Let's just go to Exhibit 5.
 9            THE AUDIOVISUAL TECHNICIAN:  Document 3;
10   correct?
11            ATTORNEY JENKINS:  Yes.  Thank you.
12   BY ATTORNEY JENKINS:
13       Q   And, Mr. Robertson, do you recognize this
14   document?
15       A   Yeah.
16       Q   And this is defendant AMI's response to
17   plaintiff's first set of interrogatories in this action?
18       A   Yes.
19       Q   Could we go to the third page from the last.
20   The next page actually.  There we go.
21            Sir, this page is called verifications.
22            And we could -- we scroll down a tiny bit
23   more.  Great.
24            Mr. Robertson, is that your signature dated
25   March 18th, 2021, and on the verification to these
```

JAMES ROBERTSON

March 26, 2021

1    interrogatory responses?

**2**        A    **Yes, it is.**

3        Q    Can we go to page 5, and the

4    Interrogatory No. 11 and its response.

5            In response to -- or excuse me --

6    Interrogatory No. 11 asks AMI to "IDENTIFY each DOCUMENT

7    and/or COMMUNICATION compromising the PORNOGRAPHIC

8    MATERIALS."  And AMI, in its response, at the end of --

9    well, at line 25 identifies three documents comprising

10   the pornographic materials, see documents WMSG-001263,

11   002026, and 002121.

12           Do you see where I'm reading there from

13   line 25 of page 5 of the exhibit, sir?

**14**       A    **Yes, I do.**

15       Q    Okay.  And so AMI has represented that those

16   three documents compromise the pornographic materials;

17   correct?

**18**       A    **Yes.**

19       Q    Thank you.

20           Let's go to document 7.  Can we mark it as

21   Exhibit 6.

22           (Exhibit 6 marked.)

23           ATTORNEY JENKINS:  And could we scroll down to

24   the document Bates-labeled WMSG 1263.  Is there a way to

25   shrink it just a teensy bit.  Perfect, okay.

JAMES ROBERTSON

March 26, 2021

```
 1            And could we also put that side by side with
 2    Exhibit 4.
 3            THE AUDIOVISUAL TECHNICIAN:  Are you getting
 4    both of those?
 5            ATTORNEY JENKINS:  Yeah.  But I think you have
 6    put up --
 7            THE AUDIOVISUAL TECHNICIAN:  Oh, I'm sorry.  I
 8    put up document 4.  Let me put up document 6, Exhibit 4.
 9    BY ATTORNEY JENKINS:
10        Q    Okay.  Mr. Robertson -- thank you, Nicole.
11            At the very bottom, right corner of the
12    document on the left, you see the Bates No. WMSG-001263?
13        A    That's not visible on my screen.
14        Q    Is the entire document not visible or just
15    parts of it?
16        A    The reference number that you stated isn't
17    visible, but I can see parts of the document.
18        Q    Okay.  Maybe if we scrolled up a little bit.
19            THE AUDIOVISUAL TECHNICIAN:  It doesn't allow
20    me to scroll when we're side by side like this.
21            ATTORNEY JENKINS:  Okay.
22            ATTORNEY MITCHELL:  I think I can see 1263 on
23    the bottom of this screen on the left.  I see that.
24    BY ATTORNEY JENKINS:
25        Q    Okay.  Well, I will represent to you, sir
```

JAMES ROBERTSON

March 26, 2021

1   that, the Bates number in the bottom, right corner of

2   this document, which is Exhibit 6, has the

3   Bates No. WMSG-001263 representing that AMI produced it

4   in this action, and it is the first of the

5   three documents from AMI's interrogatory responses

6   identified as the pornographic materials.

7           So are you able to view the document on the

8   right side of the monitor, Mr. Robertson?

9   **A     If you're referring to the "medium" blog post,**

10  **yes.**

11      Q    Okay.  Right.

12          And we're looking at a page from Exhibit 4.

13  And we see the text from the letter from Mr. Howard to

14  Mr. Bezos.  And there should be ten items listed.  And

15  so I'm going to start with the sentence:

16              "In addition to the 'below the belt

17              selfie -- otherwise colloquially known as

18              a dick pic -- The Enquirer obtained a

19              further nine images."

20          So let me back up for a second, sir, and ask

21  you.  You understand that this case involves, in part,

22  an allegation surrounding an alleged "below the belt

23  selfie" of Mr. Jeff Bezos?

24          ATTORNEY MITCHELL:  Object to the form of the

25  question.  You're asking him does he understand what the

JAMES ROBERTSON

```
 1  case is about?  You should be asking him, as a fact

 2  witness, facts, but I'll allow him to answer.

 3          THE WITNESS:  Could you repeat that,

 4  Mr. Jenkins.

 5  BY ATTORNEY JENKINS:

 6      Q    Sure.

 7          You -- you understand that this case involves

 8  an alleged "below the belt selfie" of Mr. Jeff Bezos's

 9  genitalia?

10      A    Yes, I am.

11      Q    Okay.

12          So looking at the document on the left of the

13  screen, WMSG-001236, is there anything in there a "below

14  the belt selfie"?

15      A    By the manner of the belt and images below

16  that, yes.  But not in the term of a -- as is described

17  in the "medium" post, a dick pic.

18      Q    Okay.  So the -- the next two items in the

19  "medium" post, "Mr. Bezos face selfie at what appears to

20  be a business meeting" and "Ms. Sanchez's response -- a

21  photograph of her smoking a cigar in what appear to be a

22  simulated sex scenes."

23          Are either of those images depicted in

24  WMSG 1263?

25      A    No, they're not.
```

JAMES ROBERTSON

March 26, 2021

```
 1      Q    A -- next (as read):
 2               "A shirtless Mr. Bezos holding his
 3           phone in his left-hand -- while wearing
 4           his wedding ring.  He's wearing either
 5           tight cargo pants or shorts -- and his
 6           semi-erect manhood is penetrating the
 7           zipper of said garment."
 8           Is that photograph depicted in WMSG 1263?
 9      A    Yes, I believe it is.
10      Q    Okay.  Could you indicate perhaps by row and
11  column number which picture or pictures constitute that
12  particular image?
13      A    Yes, row 1, images 1 and 2, and row 2,
14  images 1 and 2.
15      Q    Okay.  And it's your opinion that in those
16  photographs Mr. Bezos's semi-erect manhood is
17  penetrating the zipper of his cargo pants or shorts?
18           ATTORNEY MITCHELL:  Objection.  It's not an
19  opinion.  If you're asking him for his observation . . .
20           ATTORNEY JENKINS:  Observation will do.
21           THE WITNESS:  In this document, the resolution
22  isn't strong enough or clear enough for me to make that
23  determination for you here.
24  BY ATTORNEY JENKINS:
25      Q    Okay.  We'll come back to that.
```

JAMES ROBERTSON

```
1              Next on the list, "A full-length" -- maybe
2    actually back up.
3              Is it fair to say that in the first
4    four images of -- all the -- all four images in column 1
5    of WMSG 1265, there is no head in any of the subject
6    pictures?
7              ATTORNEY MITCHELL:  Do you mean row or column,
8    Mr. Jenkins?
9              ATTORNEY JENKINS:  Did I say column?
10             ATTORNEY MITCHELL:  You did.
11             ATTORNEY JENKINS:  Thank you for the
12   correction.  Yes, I did mean row.
13             THE WITNESS:  That is correct, there are no
14   heads visible in the first row.
15   BY ATTORNEY JENKINS:
16        Q    Okay.  And -- and, therefore, the identity of
17   the subject of the photograph is relatively difficult to
18   ascertain; is that fair?
19        A    If you -- yeah.  There's no facial recognition
20   available in the first row.
21        Q    Let's -- oh, we can't scroll, can we?  Okay.
22   I'll come -- all right.
23             A -- okay.  Next item:
24                  "A full-length body selfie of
25                  Mr. Bezos wearing just a pair of tight
```

JAMES ROBERTSON

March 26, 2021

```
 1              black boxer-brief or trunks, with his
 2              phone in his left hand while wearing his
 3              wedding ring."
 4              Does that photograph appear in WMSG 1263?
 5      A    Yes, it does.
 6      Q    Okay.  Could you identify which image that is?
 7      A    Yeah.  And to clarify, the cargo pants, I've
 8  misidentified the repetition of the images.  So to
 9  clarify, the -- the cargo pants, that would be row 1,
10  image 2; row 2, image 2.
11              And so the question you just asked regarding
12  the boxer briefs, that would be row 1, image 1 and
13  row 2, image 1.
14      Q    Okay.  And row 1, image 2 is one of the ones
15  that you identified as being headless; correct?
16      A    Row 2, image 1 is clear that Mr. Bezos's head
17  is photographed in that -- in that image.
18      Q    Okay.  But not in row 1, photograph 2?
19      A    That's correct.
20      Q    And anything about either of those photographs
21  that appears pornographic or scandalous to you?
22              ATTORNEY MITCHELL:  Objection.  Vague.
23              You can answer.
24              THE WITNESS:  By the definition that we agreed
25  of the term "pornographic," yes.  And by the definition
```

JAMES ROBERTSON

March 26, 2021

1    of what I determined to be scandalous, yes.

2    BY ATTORNEY JENKINS:

3        Q    Okay.  I -- I should have clarified.

4             I was using pornographic not in the defined

5    sense of pornographic materials but in a generic term.

6    Perhaps you could explain, what would you consider to be

7    a reasonable definition of pornographic?

8             ATTORNEY MITCHELL:  Objection.  Relevance.

9             But go ahead and answer.

10            **THE WITNESS:  My definition of pornographic**

11   **would be full nude.  And the image here, I would**

12   **describe as semi-nude and could be considered by some as**

13   **pornographic, yes.**

14   BY ATTORNEY JENKINS:

15       Q    Could be considered by some, okay.

16            On what basis do you make the statement that

17   some could consider those two particular images to be

18   pornographic?

19       **A    Because these images would be used to promote**

20   **pornographic materials.**

21       Q    What do you mean by "promote pornographic

22   materials"?

23       **A    If they would be a adult magazine or a**

24   **pornographic magazine or production, an image such as**

25   **the ones you represent in here, I -- I would imagine can**

JAMES ROBERTSON

```
 1    be used as covers or promotional materials for that.
 2         Q    Covers or promotional materials for actually
 3    pornographic material?
 4         A    Correct.
 5         Q    I see.
 6              Okay.  So next item from Mr. Howard's letter,
 7    "A selfie of Mr. Bezos fully clothed."  Do we see any of
 8    those in WMSG 1263?
 9         A    No.
10         Q    Next item, "A fully length scantily-clad body
11    shot with short trunks."  Is that image anywhere in
12    WMSG 1236?
13         A    I think it could be determined to be one of
14    the images on that document, but it may also be one that
15    is not featured here.
16         Q    Okay.  Fair enough.
17              Which image do you think could possibly be the
18    subject photograph?
19         A    The definition of that could be considered to
20    be image 1, row 1; image 1, row 2.
21         Q    Fair enough.  And those are the -- among the
22    images that you -- correct me if I'm wrong -- among the
23    images that you previously said could be deemed
24    potentially pornographic if affixed to the cover of a
25    magazine containing actual pornographic content?
```

JAMES ROBERTSON

March 26, 2021

```
1       A     Yes.

2       Q     Next on the list, "Ms. Sanchez" -- whoop.

3   Sorry, I skipped one.

4             "A naked selfie in a bathroom --

5             while wearing his wedding ring.

6             Mr. Bezos is wearing nothing but a white

7             towel -- and the top of his pubic region

8             can be seen."

9             Does that image appear in WMSG 1263?

10      A     Yes, it does.

11      Q     And where?

12      A     The image appears row 1, image 3 and row 2,

13  image 3.

14      Q     Okay.  Row 1, image 3 is one of the headless

15  images; correct?

16      A     Correct.

17      Q     And in either row 1, image 3 or row 2,

18  image 3, can the top of Mr. Bezos's pubic region be

19  seen?

20      A     In the examples being shown to me here, I'm

21  unable to make a determination because of the

22  resolution, size, and quality --

23            (Reporter clarification.)

24            THE WITNESS:  I'm unable to make a

25  determination of what can or cannot be seen to such
```

JAMES ROBERTSON

March 26, 2021

```
 1   specificity because of the size, resolution, and quality
 2   of the image.
 3   BY ATTORNEY JENKINS:
 4        Q    Now, these images are same resolution.  Is
 5   it -- is it possible to blow this up a little bit?
 6             Sir, is it fair to say that these images are
 7   approximately the same resolution that were e-mailed to
 8   you by Mr. Sanchez?
 9        A    No.  This is a -- this is a photocopy, so
10   naturally the quality of the image is significantly
11   reduced.
12        Q    Anything else different about these images
13   than the ones that were delivered to you by Mr. Sanchez?
14        A    In this exhibit, no.  But the exhibit I
15   received, of course, was color, and this is black and
16   white.
17        Q    Okay.  We'll look at those in a little bit.
18             Next item:
19                 "Ms. Sanchez wearing a plunging red
20                 neckline dress revealing her cleavage and
21                 a glimpse of her nether region."
22             Do we have that photograph in WMSG 1266?
23        A    In regards to the same, as I -- again, I don't
24   have that footnote, but, yes, the image you described is
25   in the same row of images that we're previously
```

JAMES ROBERTSON

March 26, 2021

```
 1  discussing.

 2      Q    And which particular image?

 3      A    The image described as Ms. Sanchez in a red

 4  neckline dress appears in the document.

 5      Q    Which image in particular are you describing?

 6      A    Row 1, image 4.

 7      Q    Okay.

 8           And that is one of the headless images we

 9  previously discussed; correct?

10      A    That's correct.

11      Q    And do you see any glimpses of a nether

12  region?

13      A    Again, because --

14           ATTORNEY MITCHELL:  Object -- object.  Vague

15  term.

16           Go ahead.

17           THE WITNESS:  Again, the resolution and the

18  image being reduced in quality and size and in black and

19  white, I'm unable to make any observations of that

20  merit.

21  BY ATTORNEY JENKINS:

22      Q    And just for clarification, what -- what are

23  your personal understanding -- or should I say what is

24  AMI's understanding of what is meant by nether region?

25           ATTORNEY MITCHELL:  Object.
```

```
 1            You can answer.
 2            THE WITNESS:  Area of a -- above the thigh and
 3   below the waist.
 4   BY ATTORNEY JENKINS:
 5       Q    Of -- and any particular area above the thigh
 6   and below the waist or just generally --
 7       A    In -- in general, hence the -- the use of
 8   region.
 9       Q    The final image, "Ms. Sanchez wearing a
10   two-piece red bikini with gold detail dress revealing
11   her cleavage."  Does that image appear anywhere in
12   WMSG 1263?
13       A    Yes, it does.
14       Q    And where would that be?
15       A    The image appears on row 1, image 5.
16       Q    And that's a headless image; correct?
17       A    That is correct.
18       Q    And are you able to observe any cleavage in
19   that particular photograph?
20       A    Yes, cleavage is clear in that photograph.
21       Q    Anything about that photograph that you would
22   consider to be pornographic?
23            ATTORNEY MITCHELL:  Clarity.  Are you asking
24   his definition, your plaintiff's definition, or the
25   interrogatory's definition?
```

ATTORNEY JENKINS: I'm asking just his -- or AMI's general definition and understanding of pornographic as we discussed previously.

ATTORNEY MITCHELL: Personal understanding of the -- as a -- as a representative of American Media, okay.

**THE WITNESS: The same opinion I hold for this image is the same as I hold of the ones that we previously discussed.**

BY ATTORNEY JENKINS:

Q Okay. So -- so they -- they could be a -- a prelude to actual pornographic materials; correct?

**A That would be a fair judgment, yes.**

Q Okay. And could the same be said of the image in row 1, image 4?

**A I'd reserve that opinion until I could see the colored image or the high-resolution image.**

Q Okay.

Nicole, could you -- actually, I want to scroll up on the left-hand document. So can we get rid of the one on the right for now.

THE AUDIOVISUAL TECHNICIAN: What was the number for the left-hand document?

ATTORNEY JENKINS: It was Exhibit -- it was document 7. Let me get the exhibit number.

JAMES ROBERTSON

1            Exhibit 6.  Can we go all the way to the top.

2     BY ATTORNEY JENKINS:

3         Q    Mr. Robertson, does this appear to be -- we're

4     looking at the first page of Exhibit 6, does this appear

5     to be an e-mail sent to you by Mr. Sanchez on

6     October 23rd, 2018, with marked attachments

7     Project 77.docx?

8         A    Yes.

9         Q    Okay.  And the images that we were just

10    reviewing in WMSG 1266 were attached to this e-mail;

11    correct?

12        A    Correct.

13        Q    Nicole, can we replace this with

14    Document No. 29, which we will mark as Exhibit 7.

15            (Exhibit 7 marked.)

16    BY ATTORNEY JENKINS:

17        Q    Now, sir, I'll represent to you that this is

18    the attachment that we were previously looking at and

19    the actual attachment simply converted from Word version

20    to pdf.

21            Nicole, can we go down to the fourth page, I

22    believe, of Exhibit 7.  There we go.  Scroll up a teensy

23    bit.

24            Okay.  So, sir, this is the version of the

25    documents that we previously viewed as part of Exhibit 6

```
 1    as Mr. Sanchez actually e-mailed them to you; correct?
 2         A    Correct.
 3         Q    Okay.  And so we have a bit better resolution
 4    and they're in color; correct?
 5         A    Correct.
 6         Q    Okay.  So you previously indicated you were
 7    unable to ascertain from the previous exhibit whether or
 8    not -- and I'm going to -- rather than put it up on the
 9    screen, just read from Exhibit 4, whether or not in any
10    of the images Mr. Bezos's semi-erect manhood was
11    penetrating the zipper of his garment.
12              Are you able to ascertain that from what has
13    been marked as Exhibit -- or a page from Exhibit 7?
14         A    Yes.
15         Q    And what is your observation?
16         A    That there is a clear bulge in the groin area.
17         Q    In which photograph are you referring to?
18         A    Row 2, image 2, which is replicated in row 1,
19    image 2, but is cropped on the face and above the waist.
20         Q    So do you see any bulging manhood in row 1,
21    Exhibit 2?
22         A    No.
23         Q    Okay.
24              But you do see -- can we blow this up a little
25    bit, Nicole.  And so -- little too much.
```

JAMES ROBERTSON

March 26, 2021

```
 1              So, Mr. Robertson, your testimony is that you
 2     see bulging manhood in the photograph at row 2, image 2?
 3              ATTORNEY MITCHELL:  Object to the relevance.
 4              You can answer.
 5              THE WITNESS:  Yes.
 6              ATTORNEY JENKINS:  Okay.  Can we zoom out of
 7     the little bit, please.
 8     BY ATTORNEY JENKINS:
 9         Q    Mr. Robertson, as to the row 1, Exhibit 4,
10     your previous testimony was that you are -- were unable
11     to ascertain from the previous exhibit whether or not
12     nether regions were observable in that photograph.  Are
13     you able to observe any nether regions in the image at
14     row 1, image 4?
15              ATTORNEY MITCHELL:  Object to relevance.
16              You can answer.
17              THE WITNESS:  Yes.  The region is visible in
18     the color image, row 1, image 4.
19     BY ATTORNEY JENKINS:
20         Q    Where in the image are you referring to
21     specifically?
22         A    The shaded area of person's groin.
23              (Reporter clarification.)
24              THE WITNESS:  Upper -- upper thigh -- upper
25     thigh groin area, that region.
```

JAMES ROBERTSON

March 26, 2021

```
 1   BY ATTORNEY JENKINS:
 2       Q    Okay.  So you see groin area in this picture?
 3            ATTORNEY MITCHELL:  Objection.  Not what he
 4   said.
 5   BY ATTORNEY JENKINS:
 6       Q    Sir?
 7            ATTORNEY MITCHELL:  You -- you -- I
 8   objected -- you can answer.
 9            If you want to repeat the question, Jonathan,
10   maybe he missed the question.
11   BY ATTORNEY JENKINS:
12       Q    Yeah, Mr. Robertson, I just was asking if
13   you -- your opinion was that you can see groin area in
14   row 4, Exhibit 1?
15       A    I can see upper and inner thigh and the shaded
16   area of the groin area, but I cannot see skin or flesh
17   of the groin area, to clarify.
18       Q    Thank you.
19            And the fifth image in row 1, you had
20   previously indicated that you could not ascertain from
21   the previous exhibit whether or not this image could be
22   potentially pornographic.  Are you able to make that
23   determination from the image in this exhibit?
24       A    I believe I identified cleavage, which, again,
25   I can -- I can -- is visible here.
```

JAMES ROBERTSON

```
 1        Q    Right.  What I had intended to ask was whether
 2   you could now determine, given the additional resolution
 3   and color, whether or not this image at image 5, row 1
 4   was among the category of images that you previously
 5   identified that were -- the term was potentially
 6   pornographic -- could be used on the cover of actually
 7   pornographic material.  Do you recall that testimony,
 8   sir?
 9        A    Yes.
10        Q    Okay.  And so what I'm asking is, given the
11   enhanced resolution and color in Exhibit 7, are you now
12   able to make that determination?
13        A    Yes.
14             ATTORNEY MITCHELL:  Object to the relevance.
15             You can answer.
16             THE WITNESS:  Yes.
17   BY ATTORNEY JENKINS:
18        Q    Okay.  And what is your determination?
19        A    My determination is that the nature of this
20   image would be fitting within pornographic material.
21        Q    Okay.  Let me try again.  I wasn't actually
22   asking about the defined term "pornographic materials."
23   I was asking if you believed that -- well, let me go at
24   it a different way.
25             Did you believe, you know, with AMI's general
```

1   understanding of the term "pornography," that image 5,
2   row 1 is pornographic?
3       A    Of the dictionary term pornographic or my
4   understanding of -- as I -- can you clarify, sir.
5            (Reporter clarification.)
6            THE WITNESS:  I -- I'm just trying to make
7   sure I answer appropriately that -- you're asking if
8   I -- if -- if this is pornographic or is this considered
9   by myself in the opinion I outlined previously?
10  BY ATTORNEY JENKINS:
11      Q    Yes.  I just want your general understanding
12  of the term -- terminology, not the legal or dictionary
13  definition.
14      A    This fits in with the opinion that I -- I gave
15  previously that the image is of such provocative nature
16  that it would be fitting with pornographic material, but
17  that this specific material is -- is -- how -- yeah --
18  how I -- how I outlined it previously.  But, yes, this
19  image would fall into that umbrella.
20      Q    Great.
21           Let's take down Exhibit 7.  And let's put up
22  document 8 and actually mark it Exhibit 8.
23           (Exhibit 8 marked.)
24           ATTORNEY JENKINS:  Could we perhaps reduce the
25  size a little so we get both images and the

JAMES ROBERTSON

March 26, 2021

1  Bates number.  Okay.  That -- that -- that's good for
2  now.  We can play with the sizing in a minute.
3  BY ATTORNEY JENKINS:
4      Q    Mr. Robertson, do you see the lower,
5  right-hand corner Bates No. WMSG-002026?
6      **A    Yes, I do.**
7      Q    And this is the second document in AMI's
8  interrogatories that comprise the pornographic materials
9  as defined in the first amended complaint?
10          ATTORNEY MITCHELL:  Objection.  That's not
11  correct.  It says as defined in response to the
12  interrogatory.
13          **THE WITNESS:  Sorry.  Did you hear**
14  **Mr. Mitchell then, Mr. Jenkins?**
15          ATTORNEY MITCHELL:  I'll stay it louder.
16          Mr. Jenkins, the -- the answer to
17  Interrogatory No. 11 is based on interpretation of the
18  term "pornographic materials" as set forth in the
19  response, which I believe is different than as defined
20  in the complaint.
21          ATTORNEY JENKINS:  No.  It refers to page 60
22  and the complaint goes on to define those exact same
23  materials as "pornographic materials" in paragraph 62.
24          But I'll accept your clarification,
25  Mr. Mitchell.

JAMES ROBERTSON

March 26, 2021

```
1    BY ATTORNEY JENKINS:

2        Q    Mr. Robertson, you recognize that this is the

3    second of three documents identified by AMI's

4    interrogatory responses as compromising pornographic

5    materials as defined by plaintiff's first set of

6    interrogatories?

7        A    Yes.

8        Q    Let's put Exhibit 8 side by side with

9    Exhibit 4.  Whoops.  I'm going to need that document

10   scrolled.

11           THE AUDIOVISUAL TECHNICIAN:  I actually can

12   scroll.  It was at the bottom of the page on the other

13   one, which is why it wasn't scrolling.

14           ATTORNEY JENKINS:  Got it.

15   BY ATTORNEY JENKINS:

16       Q    Okay.  Mr. Robertson, so just to be clear,

17   we're now looking at WMSG 2026 side by side with the

18   portion of Exhibit 4 in which Mr. Howard describes

19   pornographic materials allegedly in his possession.

20           Could -- look at the top of the page,

21   "Mr. Bezos face selfie at what appears to be a business

22   meeting."  Is that referring to the first image at the

23   top of WMSG 2026?

24       A    Yes.

25       Q    Okay.  And anything remotely pornographic or
```

JAMES ROBERTSON

March 26, 2021

1    sexual about that image?

**2         A     If you're referring to Mr. Howard's note on**

**3    the right-hand side, I don't think it lists pornographic**

**4    as a description for this image.**

5         Q     Okay.  But -- but, I mean, is there anything

6    pornographic, sexual, or inappropriate about that

7    first image on WMSG 2026?

8              ATTORNEY MITCHELL:  Objection.  Vague.

9              You can answer.

**10             THE WITNESS:  Inappropriate that he's sending**

**11   it to the recipient, yes.  By the virtue of the content**

**12   of the image to be removed from context, no.**

13   BY ATTORNEY JENKINS:

14        Q     Why is it inappropriate that he is sending it

15   to Ms. Sanchez?

**16        A     I -- it's an opinion based on the -- the**

**17   parties being married to other persons.**

18        Q     And that makes it inappropriate for them to

19   send selfies at business meetings?

20             ATTORNEY MITCHELL:  Objection.  Relevance.

21   We're getting close to the place where I'm going to cut

22   off -- it's well beyond the December 29th order at this

23   point.

24             You can answer that question.  But that's the

25   last one on this line.

JAMES ROBERTSON

March 26, 2021

1          THE WITNESS:  With the context in the message
2    above it and from my own personal conduct, no, I do not
3    send selfies of myself to other women while I'm at
4    business meetings.
5    BY ATTORNEY JENKINS:
6        Q    And next:
7               "Ms. Sanchez's response -- a
8               photograph of her smoking a cigar in what
9               appears to be a simulated oral sex
10              scene."
11              Is that a reference to the second picture on
12   WMSG 2026?
13       **A    Yes.**
14       Q    Are you able to identify Ms. Sanchez in the
15   second photograph on WMSG 2626?
16              ATTORNEY MITCHELL:  Objection.  Are you asking
17   him from the photo itself?
18              ATTORNEY JENKINS:  Correct.
19          **THE WITNESS:  Not in the image that you've
20   provided because it is not in color and it is cropped,
21   so I'm unable to identify fully at this time if that
22   person is Ms. Sanchez.**
23   BY ATTORNEY JENKINS:
24       Q    Are you representing that at some point in
25   time you received an image that was -- excuse me -- a

JAMES ROBERTSON

March 26, 2021

1    version of the second photograph in WMSG 2026 that was
2    uncropped and in color?
3         **A    I do not recall regarding the crop, but I do**
4    **recall receiving all screenshots and images from**
5    **Mr. Sanchez in color.**
6         Q    But do you have any understanding as to where
7    Ms. Sanchez was when she took the second photograph --
8    or the second selfie at -- located on WMSG 2026?
9         **A    I recall being told, but I do not recall the**
10   **specific answer to that question.**
11        Q    Let's -- actually before we move on.  We see
12   the reference to the "below the belt selfie," otherwise
13   colloquially known as a "dick pic," referenced at the
14   top of the page we're looking at from Exhibit 4?
15        **A    Yes.**
16        Q    Okay.  Let's take everything down.  Put up
17   document 9 and mark it Exhibit 9.
18             (Exhibit 9 marked.)
19             ATTORNEY JENKINS:  For the record, this is
20   WMSG 2121, which is the third item listed in AMI's
21   interrogatory responses comprising the pornographic
22   materials.
23   BY ATTORNEY JENKINS:
24        Q    Is that a correct statement, Mr. Robertson?
25        **A    Yes.**

JAMES ROBERTSON

March 26, 2021

```
 1      Q    And is this a "below the belt selfie," also
 2   known as a dick peck?
 3           ATTORNEY MITCHELL:  Objection.  "Dick pic" do
 4   you mean?
 5           Objection.
 6           You can answer.
 7           THE WITNESS:  No.
 8   BY ATTORNEY JENKINS:
 9      Q    Okay.  In fact, this is a -- a drawing that
10   Ms. Andrea Simpson, an -- who was an AMI reporter, drew;
11   correct?
12      A    Yeah.
13      Q    And what is your understanding of why
14   Ms. Simpson drew this image?
15      A    To memorialize what she saw.
16      Q    Let's come back to that in a second.  So this
17   image was never received by M.S. -- AMI from
18   Mr. Sanchez; correct?
19           ATTORNEY MITCHELL:  Objection.  Which image?
20           ATTORNEY JENKINS:  WMSG 2121, the one right in
21   front of us.
22           ATTORNEY MITCHELL:  Are you asking -- still
23   objection.  I don't understand.
24           You're asking this image, this drawing image,
25   was this ever received by American Media?
```

JAMES ROBERTSON

March 26, 2021

```
 1   BY ATTORNEY JENKINS:

 2       Q    Mr. Sanchez never sent this image to AMI;

 3   correct, Mr. Robertson?

 4       A    That's correct.

 5       Q    Did AMI ever have an actual "below the belt

 6   selfie" or "dick pic" of Mr. Bezos from any source

 7   whatsoever?

 8       A    As part of our news gathering, we received it,

 9   but temporarily.

10       Q    And when and how did you receive it

11   temporarily?

12       A    On the day Ms. Simpson drew this exhibit,

13   Mr. Sanchez had provided Ms. Simpson with a hard copy of

14   Mr. Bezos's penis, and that is where Andrea reviewed the

15   image.

16       Q    No one else other than -- no one else at AMI

17   other than Ms. Simpson ever saw the penis image to which

18   you're referring; correct?

19       A    That is correct.

20       Q    And -- so you never saw the penis image;

21   correct?

22       A    That is correct.

23       Q    Okay.

24            And are you aware that Mr. Sanchez testified

25   that what he actually showed you was a random dick pic
```

JAMES ROBERTSON

March 26, 2021

```
 1   from the Internet and had nothing to do with Mr. Bezos
 2   whatsoever?
 3           ATTORNEY MITCHELL:  Objection.
 4           THE REPORTER:  I'm sorry.  Was there an
 5   answer?  I didn't hear.
 6           THE WITNESS:  Can you repeat the question.
 7   BY ATTORNEY JENKINS:
 8       Q    I said are you aware of Mr. Sanchez's
 9   testimony yesterday during his deposition that what
10   Ms. Simpson -- what he actually showed Mrs. Simpson was
11   a dick pic he downloaded from the Internet and had
12   nothing to do with Mr. Bezos whatsoever?
13           ATTORNEY MITCHELL:  I'm going to object as it
14   calls for potential attorney-client communications.  I
15   will allow him to answer the question as to his current
16   state of knowledge with respect to what Mr. Sanchez
17   testified to yesterday but not disclose any client
18   conversations.
19           ATTORNEY JENKINS:  That's a fair objection.
20   Not -- in no -- in none of my questions am I attempting
21   to extract the content of privileged communication --
22           ATTORNEY MITCHELL:  I understand when he
23   was -- and I -- maybe -- maybe I should take a moment
24   and make sure Mr. Robertson understand what he should or
25   shouldn't disclose but -- can I just take a --
```

JAMES ROBERTSON

```
 1              (Reporter clarification.)
 2              ATTORNEY MITCHELL:  I would like to speak to
 3    Mr. Robertson just to make sure that he understands what
 4    he can or can't say with respect to waiving potential
 5    privileged communications.
 6              That's all right, Mr. Jenkins, can we take
 7    two seconds?
 8              ATTORNEY JENKINS:  You want to go off the
 9    record?  It's probably about time for a ten-minute
10    break.
11              ATTORNEY MITCHELL:  Okay.  Thank you.
12              ATTORNEY JENKINS:  Okay.
13              (Pause in the proceedings.)
14              (Record read as follows:
15                 "Are you aware of Mr. Sanchez's
16                 testimony yesterday during his deposition
17                 that what Ms. Simpson -- what he actually
18                 showed Mrs. Simpson was a dick pic he
19                 downloaded from the Internet and had
20                 nothing to do with Mr. Bezos
21                 whatsoever?")
22    BY ATTORNEY JENKINS:
23         Q    Are you able to respond to that question
24    without violating the attorney-client privilege, sir?
25         A    Yeah.  Are we back on the record?
```

JAMES ROBERTSON

March 26, 2021

```
 1                ATTORNEY MITCHELL:  Yes.
 2                THE WITNESS:  Yeah.  I'm aware of
 3     Mr. Sanchez's testimony.
 4     BY ATTORNEY JENKINS:
 5         Q    Okay.
 6              And, in fact, Mr. Sanchez -- the "below the
 7     belt selfie" that we showed Ms. Simpson, it was a hard
 8     copy; correct?
 9         A    Yes.
10         Q    It wasn't in electronic format or on an
11     iPhone or anything like that?
12         A    I don't recall if Mr. Sanchez also showed
13     Andrea digital copies.  But from what I'm aware of, it
14     was a printed copy.
15         Q    Right.  But -- but you caught the whole thing
16     on video; right?
17         A    Correct.
18         Q    And at no point in time did Mr. Sanchez
19     actually let go of the hard copy of the Internet
20     dick pic, did he?
21         A    That specific physical passing over, I don't
22     recall.  My recollection from the video, I'm not -- I'm
23     not confident to say either way.
24         Q    Okay.  When -- when the meeting was over,
25     Mr. Sanchez took the "below the belt selfie" with him;
```

JAMES ROBERTSON

March 26, 2021

```
1   correct?
2       A    Yes.
3       Q    Okay.  And so from that point on, did AMI at
4   any point in time -- well, let me start over.
5            Other than the one incident that we just
6   described, did AMI at any time, from any other source,
7   have an actual "below the belt selfie" or dick pic of
8   Mr. Bezos?
9       A    No.
10      Q    Other than that one incident, did AMI --
11  anyone at AMI ever review or look at a picture or an
12  electronic version of a dick pic, "below the belt
13  selfie" of Mr. Bezos from any other source?
14      A    Not that I'm aware of.
15      Q    Okay.  Is there anyone who might be aware of
16  that other than you?
17      A    Ms. Simpson, by virtue of her being in the
18  presence of Mr. Sanchez on that day.
19      Q    What about Mr. Howard?
20      A    To my understanding, Mr. Howard is in the same
21  position as I am.  But, no, we do not believe that any
22  other AMI employee possessed or saw.
23      Q    Okay.  Have you had any discussions with
24  Mr. Dylan on this particular -- excuse me -- Mr. Howard
25  on this particular topic?
```

JAMES ROBERTSON

```
 1              So let's go now to document 11 and mark it
 2    Exhibit 11.
 3              (Exhibit 11 marked.)
 4    BY ATTORNEY JENKINS:
 5       Q    And this -- feel free to correct me if I'm
 6    wrong -- appears to be a chain of e-mail correspondence
 7    between you and a Mr. Dominic Utton, U-t-t-o-n,
 8    "Subject:  Re: Job for Sunday" that occurred -- or
 9    spanned January 5th and January 6th, 2019.
10              Is that an accurate description,
11    Mr. Robertson?
12       A    Yes, it is.
13       Q    And this is an e-mail exchange between you and
14    a Mr. Dominic Utton?
15       A    Yes, it is.
16       Q    And who was Mr. Utton?
17       A    Dominic is -- and, well, was a writer who
18    would perform tasks for various long-form writing across
19    AMI.
20       Q    And what particular task were you assigning to
21    Mr. Utton?
22       A    I was assigning him the first draft of the
23    Bezos affair story.
24       Q    The first draft.  Was -- was there any -- were
25    there any previous working drafts or partial drafts of
```

JAMES ROBERTSON

March 26, 2021

1    the story?

2        A    At this time, I -- I cannot recall.  But there

3    were multiple reporting and writing that myself and

4    Dylan had tasked to ourselves.

5        Q    Okay.  So let's look at middle of the page,

6    Mr. Utton's e-mail to you on January 6th (as read):

7                "Hi, mates -- sorry to disturb your

8                Sunday.  Quick question.  Have you got

9                any more details on the naked photos and

10               risky" -- I presume I suppose to read

11               "risque" -- "selfies he sent?  I can spin

12               it again but there's not much in the

13               copy."

14           So is it -- is it fair to say that whatever

15   work -- work product or draft work product Mr. Utton had

16   been sent didn't say a whole lot about the allegedly

17   naked photos and risque selfs Mr. Sanchez had allegedly

18   sent?

19               ATTORNEY MITCHELL:  Objection.

20               You can answer, if you understand.

21               THE WITNESS:  I would say, just to clarify,

22   you misread.  He said, "I can spin it a bit."  He did

23   not say, I can spin it again.

24               But I don't recall specifically what materials

25   I presented to Dominic in this e-mail chain.  I would

JAMES ROBERTSON

March 26, 2021

```
 1    refer to whatever materials were pulled from the
 2    electronic logs.
 3    BY ATTORNEY JENKINS:
 4         Q    And that information would still be in the
 5    electronic logs?
 6         A    In the same manner as how this e-mail was --
 7    was pulled, I -- yeah.
 8         Q    When you -- when you say "electronic logs,"
 9    what are you referring to?
10         A    Well, from my memory, I do not recall what
11    image attachments I sent on January 6th, 2019 --
12    January 5, 2019, to Dominic.
13         Q    So there were -- was there some other e-mail
14    in which you sent images to Mr. Utton?
15         A    From reading this below, it doesn't appear
16    that I sent him materials by him asking for more details
17    and me describing them.  I do not recall.
18         Q    Well, going back to my prior question, what --
19    what did you mean when you referred to "electronic
20    logs"?
21         A    Electronic logs, e.g., this e-mail is as much
22    of a recollection as I have.  So I'd refer to my writing
23    and descriptions here as opposed to my memory on this
24    instance.
25         Q    Okay.  But is there some other electronic log
```

JAMES ROBERTSON

March 26, 2021

```
 1   other than e-mail that are -- AMI maintains or
 2   maintained in connection with its reporting of stories?
 3        A    No.
 4        Q    In your --
 5             (Reporter clarification.)
 6   BY ATTORNEY JENKINS:
 7        Q    So in response on -- also on January 6th,
 8   2019, you state:
 9                 "He sent multiple photos -- mostly
10             shirtless and one with only a towel
11             wrapped around him in a steamy bathroom.
12             Then the piece de resistance, a penis
13             photo."
14             Was it your intent to imply to Mr. Utton that
15   Mr. Sanchez had actually sent you a penis photo?
16             ATTORNEY MITCHELL:  Objection.
17             You can answer.
18             THE WITNESS:  No.
19   BY ATTORNEY JENKINS:
20        Q    Did you recall at ever -- any point in time
21   telling Mr. Utton that AMI did not actually have a penis
22   photo of Mr. Bezos?
23        A    That wouldn't be something I would share with
24   Dominic.
25             (Reporter clarification.)
```

JAMES ROBERTSON

```
 1            THE WITNESS:  Would not be something I would
 2   share with -- with Dominic.
 3   BY ATTORNEY JENKINS:
 4       Q    Why not?
 5       A    Because Dominic is a writer.
 6       Q    And why is the fact that he is a writer mean
 7   that he wouldn't receive information such as AMI did not
 8   actually have a penis photo of Mr. Bezos in its
 9   possession, custody, or control?
10            ATTORNEY MITCHELL:  Objection.  These
11   questions now go nowhere near the question of what
12   American Media obtained, how it obtained it.  You're
13   inquiring as to internal discussions of whether or not
14   one employee told another about the existence of a penis
15   photo.  That is well far afield of what the court
16   ordered.
17            Answer this one question, and then we'll see
18   after that if I will allow him to answer anymore on this
19   topic.
20            (Reporter clarification.)
21            ATTORNEY JENKINS:  Well, cross that bridge
22   when we get there.
23   BY ATTORNEY JENKINS:
24       Q    Do you recall the question, Mr. Robertson?
25       A    Could you ask it again, please, Mr. Jenkins?
```

JAMES ROBERTSON

March 26, 2021

```
 1              ATTORNEY JENKINS:  Madam Reporter, could you
 2    read back the question.
 3              (Record read as follows:
 4                  "And why is the fact that he is a
 5              writer mean that he wouldn't receive
 6              information such as AMI did not actually
 7              have a penis photo of Mr. Bezos in its
 8              possession, custody, or control?")
 9              THE WITNESS:  It was Mr. Utton's task to draft
10    a version of a story.  It was not Mr. Utton's task to
11    edit it to a position of it being ready for print.
12    Therefore, certain information is not pertinent to
13    him -- him and his role.
14    BY ATTORNEY JENKINS:
15        Q    Did AMI ever publicly publish or release
16    information that it did not actually have in its
17    possession a "below the belt selfie" or penis photo of
18    Mr. Bezos?
19              ATTORNEY MITCHELL:  Objection.  Direct him not
20    to answer.  Not going any further.  This is well beyond
21    the judge's order.
22              (Reporter clarification.)
23              ATTORNEY JENKINS:  No, I'm --
24              ATTORNEY MITCHELL:  I -- I thought I was
25    clear, but I'll say it again.
```

JAMES ROBERTSON

March 26, 2021

```
 1              (Reporter clarification.)
 2              ATTORNEY JENKINS:  I'm -- I'm digging around
 3    for something.
 4              So I'm reading from page 16 of the court's
 5    December 29th, 2020 order, Mr. Mitchell, just so that we
 6    have this on the record to facilitate such judicial
 7    intervention as may be necessary.
 8              So the following topics (as read):
 9                 "One, from what source, if any, AMI
10              received any information relating to its
11              Bezos story prior to Plaintiff's admitted
12              involvement in October 2018; two, who
13              initiated contact between AMI and
14              plaintiff regarding the Bezos story;
15              three, when, how, and to what extent
16              plaintiff shared the pornographic
17              materials with anyone affiliated with
18              AMI; and, four, if AMI, in fact,
19              possesses the pornographic materials,
20              when, how, and from what sources AMI
21              received them."
22              It is our contention, Counsel, that AMI did
23    actually have the penis photograph, but did not obtain
24    it from my client but obtained it well before you ever
25    spoke with my client from a gentleman named
```

JAMES ROBERTSON

March 26, 2021

```
1   Mr. Patrick Whitesell.  So --

2           ATTORNEY MITCHELL:  Okay.  Well, this

3   witness --

4           (Simultaneous speakers interrupted by the

5           reporter.)

6           ATTORNEY MITCHELL:  Okay.  Your question is

7   with respect to Mr. Utton and internal communications

8   about his writing a story are one thing, which is

9   well -- in my mind, well outside the four topics you

10  just read.  If you wanted to inquire from Mr. Robertson

11  about what you just said concerning a potential other

12  source, that would be fair game, in my mind.  But that's

13  not the question you asked him.

14          ATTORNEY JENKINS:  It's relevant through the

15  issue I possessed.  Because if they never disclosed that

16  they didn't have a penis photo, well, you would think

17  that any honorable journalist enterprise would divulge

18  that fact to the public rather than state that it was in

19  their possession.  So --

20          ATTORNEY MITCHELL:  Yes.

21          ATTORNEY JENKINS:  -- are you going to allow

22  him to answer the question?

23          ATTORNEY MITCHELL:  And I -- I -- I think I've

24  lost track of the question at this point.  But if you're

25  asking him why American Media did or did not disclose to
```

JAMES ROBERTSON

```
 1   the public its possession of a penis photo, I don't
 2   think that is within the four corners of this, and I
 3   will continue to direct him not to answer.
 4             If you want to ask him about other sources
 5   that you believe existed, that is fair game.  That is
 6   well within the Judge's court order -- court-ordered
 7   topics, but not the first one.
 8             ATTORNEY JENKINS:  Okay.  I can see this is
 9   going to be an issue.
10             Jordan, are you on the line?
11             (Reporter clarification.)
12   BY ATTORNEY JENKINS:
13        Q    So referring back to Exhibit 11,
14   Mr. Robertson, you go on to write (as read):
15                  "We want to be vague and cannot print
16                  them and fear disclosing the specifics
17                  will out the sources, so the strategy is
18                  to talk of the existence of photos that
19                  would destroy any loving wife, knowing
20                  they were being sent to a mistress."
21             Did I read that correctly, Mr. Robertson?
22        A    I believe so, yes.
23        Q    Okay.
24             I could not help but notice that you used the
25   word "sources" in the plural rather than the singular.
```

JAMES ROBERTSON

March 26, 2021

1   Why was that?

2       A    To refer back to my previous answer, what is

3   assigned to Dominic is not relevant to the publication

4   of any article.  My communications with him do not need

5   to be -- meet the merit of publication.  My use of

6   "sources" here would have been to protect the single

7   source, which was Michael Sanchez, from being identified

8   at a later stage.

9       Q    (As read):

10             "The strategy is to talk of the

11             existence of photos that would destroy

12             any loving wife, knowing they were being

13             sent to a mistress?"

14             By "strategy," do you mean that's the angle

15   that you want Mr. Utton's story to take?

16      A    That is the angle of how I was recommending he

17   approached that specific part of the story.

18      Q    Did you ever have any conversations or e-mail

19   exchanges with Mr. Sanchez or -- regarding the angle of

20   the story?

21      A    On occasion Mr. Sanchez would suggest certain

22   editorial elements, but they were nondescript to a point

23   where I do not recall them and certainly did not

24   influence the final publication.

25      Q    Well, yes, part of your general recollection

JAMES ROBERTSON

1   that Mr. Sanchez was requesting -- obviously had no

2   editorial control but was requesting a soft-landing

3   story, for lack of a better term, in which the affair

4   would be portrayed more as a budding romance than a

5   scandalous cheating incident.

**6**   **A    What was the question?  Sorry, Mr. Jenkins.**

7   Q    Let me rephrase.

8         Wasn't it true that Mr. Sanchez was, shall we

9   say, advocating for a (buffering) --

10         (Reporter clarification.)

11  BY ATTORNEY JENKINS:

12   Q    Okay.  Let me try it again, Mr. Robertson.

13         Is it fair to say that Mr. Sanchez was

14  advocating that the story portray the affair in a

15  non-scandalous manner?

**16**   **A    If he did say that or presented that to me, it**

**17**  **would contradict what he was providing to us.**

18   Q    That wasn't my actual question, sir.  The

19  question was, did he?

**20**   **A    The phrase "soft landing" is familiar, yes.**

21   Q    You had an understanding of what Mr. Sanchez

22  meant by "soft landing"?

**23**   **A    Sir, I will use the answer I gave the past**

**24**  **point which was I understood -- I understand the meaning**

**25**  **of "soft landing," but I'm -- I was at odds then and**

JAMES ROBERTSON

March 26, 2021

```
1    still am as to how a soft landing would be possible

2    given the nature of the story and the materials being

3    provided set for publication.

4         Q    Okay.  And, again, but what -- what is your

5    understanding of what the term "soft landing" meant in

6    the context of reporting about the affair?

7         A    A "soft landing" in journalistic speak or a

8    "soft landing" in terms of this specific example?

9         Q    Well, let me -- the former first, and then the

10   latter.

11        A    For journalistic speak, a "soft landing" would

12   typically be when a celebrity gives one side of a story

13   cooperatively, the celebrity themselves, to shape and

14   mold the story as they please to give them a better

15   light than they would have done if the story would be

16   told by somebody else.

17             And on the second part, I believe the same.

18   And it was at odds with what Mr. Sanchez was providing

19   us.  But I understood the term that he was using, but it

20   did not correlate with what he was providing.

21        Q    But you -- you recognized Mr. Sanchez having

22   used the term "soft landing" as something he was hoping

23   to accomplish through the "National Enquirer's"

24   reporting?

25        A    I would say given the ex -- history of the
```

JAMES ROBERTSON

1    publication, the "National Enquirer," and Michael's

2    position of wanting a soft landing, I don't think a soft

3    landing was his priority in engaging communication with

4    the "Enquirer" about the story.

5        Q    That -- okay.  I'm -- my -- my question is --

6    is -- very simple is that Mr. Sanchez, regardless of

7    whether it was consistent with his conduct or the

8    "National Enquirer's" nature as a publication, he did,

9    in sum or substance, request that the story deliver a

10   soft landing; correct?

11       A    Correct.

12            ATTORNEY MITCHELL:  Hey, Jonathan, is it

13   almost time to take it -- we've gone about two and a

14   half hours, other than that five-minute break.  So

15   whenever you're ready for one, if you want --

16            ATTORNEY JENKINS:  I got -- I got one more

17   line, and then we're done with this exhibit.

18            ATTORNEY MITCHELL:  Okay.  Proceed.

19   BY ATTORNEY JENKINS:

20       Q    The -- the final sentence:

21            "These weren't innocent selfies

22            et cetera -- it's clear the photos were

23            sent for sexual gratification."

24            What was your basis for making that statement,

25   Mr. Robertson?

JAMES ROBERTSON

March 26, 2021

1      A    From knowledge of the images from

2  Michael Sanchez as well as the obvious conclusion I feel

3  that most would draw from reviewing those images.

4      Q    Okay.  So you were including in your analysis

5  the penis picture that you believed was of Mr. Bezos?

6      A    When I say they "weren't innocent selfies --

7  It's clear the photos," the use of that is a collective

8  term used for all the images described above, including

9  the shirtless and towel in a steamy bathroom.

10     Q    And the "piece de resistance," the penis

11  photo; correct?

12     A    Correct.

13     Q    So let's remove the penis photo from the

14  equation, the sum total of the photographs -- or the sum

15  total of the selfies sent to you by Mr. Sanchez, are you

16  of the opinion that collectively those photos were sent

17  for sexual gratification?

18          ATTORNEY MITCHELL:  Objection.

19          THE WITNESS:  Yes.

20          ATTORNEY JENKINS:  Okay.  Let's take a break.

21                    *  *  *
                 (LUNCHEON RECESS)
22                    *  *  *

23          ATTORNEY JENKINS:  Okay.  We're on the record.

24          Nicole, could you put up document 26, mark as

25  Exhibit 12.

JAMES ROBERTSON

March 26, 2021

```
 1                 (Exhibit 12 marked.)
 2    BY ATTORNEY JENKINS:
 3         Q    Mr. Robertson, this appears to be an e-mail
 4    from you to Mr. Howard, again, dated February 5th, 2019,
 5    subject, Bezos/Sanchez.  The Bates number is
 6    WMSG-000610.
 7                 Do you recognize this e-mail, sir?
 8         A    Yes.
 9         Q    And you state -- well, let me ask you first,
10    this was a standalone e-mail, two pages.  What was your
11    reason for sending this e-mail to Mr. Howard?
12         A    I don't -- I don't recall what specific reason
13    for this e-mail.
14         Q    You write:
15                 "PHOTOS:
16                 "We have 338 'paparazzi' photos that
17                 meet the standards to publish e.g. clear
18                 frames of Jeff and Lauren."
19                 What -- briefly describe what you mean by
20    "paparazzi photos."
21         A    Photos that were obtained by photographers and
22    not photos that we've obtained from Michael Sanchez.
23         Q    And were all of those paparazzi photos taken
24    at AMI's behest, or were some of them commercially
25    available through other means?
```

JAMES ROBERTSON

March 26, 2021

```
 1        A    I would have to confirm the number, but this
 2   would be photographs at the behest of AMI, and not all
 3   commercially available photographs.
 4        Q    Well, I -- I -- I didn't mean to refer to the
 5   universe of commercially available photo -- photographs.
 6   I'm just saying, were any of them photos that, you know,
 7   were agency photos that AMI had not specifically
 8   requested?
 9             ATTORNEY MITCHELL:  Objection.
10             If you understand, you can --
11             THE WITNESS:  So -- yeah.  So I'll -- I'll
12   just --
13             (Simultaneous speakers interrupted by the
14             reporter.)
15             ATTORNEY MITCHELL:  Objection.
16             You can answer if you understand, but it was
17   an unclear question.  If you do, please.
18             THE WITNESS:  If I'm right in understanding,
19   Mr. Jenkins, you're asking if these photographs were
20   obtained by AMI's reporting through photo agencies and
21   not images obtained by photo agencies predating our
22   reporting.  That would be correct.
23   BY ATTORNEY JENKINS:
24        Q    Okay.  Now, I'm a little bit lost.
25             It would be correct that some of the pictures
```

JAMES ROBERTSON

```
 1  were agency photos, or all of them were AMI-directed

 2  photos?

 3      A    All of these would be AMI-directed photos.

 4      Q    And AMI still has all those photos; correct?

 5      A    I would expect so, yes.  I believe so.

 6      Q    Your next write:

 7               "SELFIES:

 8               "As well as the penis photo, there

 9          are a total of 10 photos -- 7 of Bezos

10          and 3 of Sanchez -- that we have

11          obtained."

12          Not to -- to be argumentative, sir, but is

13  there a reason that you say "as well as the penis photo"

14  as opposed to as well as the penis sketch?

15      A    The purpose of this line is what we've

16  obtained in the news gathering.

17      Q    But you had not obtained a penis photo of

18  Mr. Bezos.  Wasn't that your testimony earlier?

19      A    That's correct.

20      Q    So were you -- which -- which penis photo were

21  you referencing?

22      A    I'm referencing here the photograph that

23  Michael Sanchez presented to Andrea Simpson as

24  Jeff Bezos's penis.

25      Q    Under text, it says, "We have 28 messages in
```

1  BY ATTORNEY JENKINS:

2      Q    Unle -- unless one or -- or the other of you

3  were in a different time zone for some reason?

4          ATTORNEY MITCHELL:  Objection.  That he --

5  e-mails can be dated many different ways, sometimes with

6  Universal Time Codes, sometimes with Eastern, Western.

7  So I'm not -- unless you have knowledge of that, I'm not

8  sure you can answer that.

9          **THE WITNESS:  I don't have knowledge of the**

10  **time zones or specific travel plans of either Mr. Howard**

11  **or I during this time.**

12  BY ATTORNEY JENKINS:

13      Q    Now, you see at the bottom of the first page

14  of Exhibit 13 Mr. Sanchez's writing On the evening of

15  January 24th, 2019.  Mr. Sanchez writes, apparently to

16  Mr. Howard:

17              "D,

18              "As I've said a thousand times

19          (please ignore overly-dramatic

20          exaggeration -- I haven't slept a full

21          night in two weeks.  'Mistress' is not

22          helpful."

23          With "not" both bolded and underlined.

24              "Since 'girlfriend' or 'new love' is

25          being used almost everywhere else, any

JAMES ROBERTSON

March 26, 2021

```
 1              chance you can ask James to help?
 2                   "THX
 3                   "M."
 4              Is it your recollection that on or about this
 5    time Mr. Sanchez had been advocating for AMI to refer to
 6    Ms. Sanchez as Mr. Bezos's "girlfriend" or "new love" as
 7    opposed to "mistress"?
 8         A    That's correct.  I do recall that.
 9         Q    And you denied that request; correct?
10         A    Correct.
11         Q    And is it a fair "characterization" of -- of
12    this e-mail that Mr. Sanchez essentially tried to go
13    over your head by asking Mr. Howard to overrule you and
14    was denied?
15         A    That's a fair interpretation of this e-mail
16    chain, yes.
17         Q    Let's go to Exhibit 14, will be document 12.
18              (Exhibit 14 marked.)
19              ATTORNEY JENKINS:  And if we could actually
20    scroll down a few pages.
21              Actually, let's go back up to the top, first.
22    BY ATTORNEY JENKINS:
23         Q    So, Mr. Robertson, I'll represent that
24    Exhibit 13, which is Bates-marked WMSG 956 through 965,
25    is an e-mail chail -- e-mail chain between you,
```

JAMES ROBERTSON

March 26, 2021

```
 1        Q    How many in-person meetings did you have with
 2   Mr. Sanchez regarding your reporting -- or your
 3   investigation of Mr. Bezos?
 4        A    I personally had one interaction with
 5   Mr. Sanchez.
 6        Q    And that took place in New York City?
 7        A    That's correct.
 8        Q    At AMI's offices?
 9        A    That's correct.
10        Q    What was the purpose of that meeting?
11        A    The purpose of the meeting was to see the
12   materials regarding a billionaire's affair.
13        Q    And what did you ask Mr. Sanchez to provide at
14   that meeting?
15        A    Mr. Sanchez provided the document previously
16   shown as an exhibit, which was titled "Project_77.docx."
17   He brought that via USB drive and subsequently sent that
18   to me via e-mail later that day.
19        Q    Okay.  And he -- he had a cell phone with him;
20   correct?
21        A    That's correct.
22        Q    And you -- you asked is -- you need -- is it
23   confirmation that at least one or more of the items
24   appeared on his cell phone; correct?
25        A    Correct.
```

JAMES ROBERTSON

March 26, 2021

1      Q     And what was the purpose of that?
2      A     To satisfy a early concern that a sibling
3   would send such material to another sibling I found
4   surprising.  And upon review, I was satisfied within a
5   matter of seconds, as we had not yet entered a formal
6   NDA, that Lauren and Michael had a relationship in which
7   it was a love -- it was real that Lauren would be
8   sharing and sending such sensitive and private
9   information to Michael.
10     Q     But you didn't ask him to verify that he had
11  the penis photo on his cell phone; correct?
12     A     That's correct.  And that would have been far
13  beyond where our conversations were at that time.  Like
14  I said, the purpose of meeting was to review early
15  materials and discuss a non-disclosure agreement.
16     Q     Right.  But I -- let me ask a better question.
17           At no point in time thereafter did you require
18  Mr. Sanchez to verify that the alleged penis photo was
19  actually on one of his electronic devices; correct?
20     A     I was satisfied with Michael as a source,
21  given the materials he provided from our first meeting,
22  throughout the reporting process, and the level of
23  intimate details and images that he provided, that his
24  presentation and what he produced to Andrea Simpson and
25  the description, given that it was sent, the image of

JAMES ROBERTSON

March 26, 2021

1   the penis -- of Jeff Bezos's penis that was sent to

2   Lauren Sanchez was part of a string of messages, which

3   Jeff Bezos's face is identified and that the cargo

4   shorts were corroborating in that photograph, I was

5   satisfied that Michael Sanchez was being truthful in

6   what he presented to us that day.

7           ATTORNEY JENKINS:  Madam Reporter, could you

8   read back the question.

9           (Record read as follows:

10              "At no point in time thereafter did

11          you require Mr. Sanchez to verify that

12          the alleged penis photo was actually on

13          one of his electronic devices; correct?")

14      **THE WITNESS:  No.  We were satisfied with what**

15  **he presented to Andrea Simpson, that he was being**

16  **truthful in what he was showing that was Jeff Bezos's**

17  **penis that was sent to Lauren Sanchez.**

18  BY ATTORNEY JENKINS:

19      Q   Had any of previous material that he had sent

20  you involve pornographic images of genitalia?

21          ATTORNEY MITCHELL:  Objection.  Time frame

22  with respect to this?

23          ATTORNEY JENKINS:  At any point in time.

24          ATTORNEY MITCHELL:  You mean before this Bezos

25  story?

JAMES ROBERTSON

March 26, 2021

```
 1              (Reporter clarification.)
 2              ATTORNEY MITCHELL:  I'm asking for a time
 3    frame.  That's all.
 4              ATTORNEY JENKINS:  From the beginning of time.
 5              ATTORNEY MITCHELL:  Okay.
 6              THE WITNESS:  I'm not -- I -- I -- I've now
 7    forgotten specifically what you asked me.
 8    BY ATTORNEY JENKINS:
 9        Q    That's okay.  I'll ask it again.
10              The other affair-related materials that
11    Mr. Sanchez had provided AMI, did any of them depict
12    actual human genitalia?
13        A    No.
14        Q    And as you said previously, AMI was very
15    concerned about verifying the authenticity of the
16    alleged penis photo; correct?
17        A    We were --
18        Q    Yes-or-no question, sir.
19        A    I -- I don't -- I disagree that that is a
20    yes-or-no question.  So apologies, Mr. Jenkins.
21        Q    Okay.
22        A    With respect, the purpose of our reviewing was
23    not -- was to confirm that Jeff had sent the penis photo
24    to Ms. Sanchez.  I'm confused by it being one way or
25    another to the second point.
```

JAMES ROBERTSON

March 26, 2021

```
 1       Q    Okay.  So AMI wanted to be sure that it had
 2   actually happened; correct?
 3       A    That's correct.
 4            ATTORNEY JENKINS:  Let's go -- let's put up
 5   document 23, which will be, I believe, Exhibit 14.
 6            (Reporter clarification.)
 7            ATTORNEY MITCHELL:  The last one was 14, yes.
 8            ATTORNEY JENKINS:  I wrote 13 twice.  Okay.
 9   So it's 15.
10            (Reporter clarification.)
11            (Exhibit 15 marked.)
12   BY ATTORNEY JENKINS:
13       Q    Is it correct to say, Mr. Robertson, that this
14   e-mail is an exchange between Mr. Howard and Mr. Sanchez
15   and you, on which Andrea Simpson is copied, dated
16   November 7, 2018?
17       A    Correct.
18       Q    So you -- you received this e-mail; right?
19       A    That's correct.
20       Q    And Ms. Simpson received this e-mail?
21       A    I assume by her receipt on this chain, yes.
22       Q    Okay.  And Mr. Howard sent the e-mail;
23   correct?
24       A    That's correct.
25       Q    And he writes, "BY virtue of your
```

JAMES ROBERTSON

```
 1   nonappearance, you've set us back a week."

 2              Would you read for me the second sentence.

 3      A    Sorry.  You'd like me to read that?

 4      Q    I would.

 5      A    (As read):

 6                "What's more, I'd like to point out,

 7             as you know, we have photos of the

 8             two subjects prior to any deal with you."

 9             Do you want me to continue, or is that okay?

10      Q    Finish the sentence, if you would.

11      A    Em dash, "as we have been investigating

12   subject for weeks."

13      Q    Is Mr. Howard's statement truthful?

14      A    Yes.

15      Q    Would it -- were you aware that an AMI

16   employee submitted a FOIA request regarding Mr. Bezos on

17   or about August 24th, 2018?

18      A    Yes.

19      Q    Do you know who that employee was?

20      A    Yes.

21      Q    Who was that employee?

22      A    Nik Hats.

23      Q    And "Hat" is short for -- not to be offensive,

24   but a long --

25      A    That's correct.
```

JAMES ROBERTSON

```
1        Q    -- Greek name which -- which is very difficult
2   for many people to pronounce.  So he's collegially
3   referred to as "Nik the Hat"; is that accurate?
4        A    That is accurate.
5        Q    At one point, you sent out an e-mail directing
6   certain reporters to undertake a deep dig on Mr. Bezos.
7   Do you recall that?
8        A    Yes.
9             ATTORNEY MITCHELL:  Objection.  It's -- sorry.
10  Belated objection.  I think it's a deep dive?
11            THE WITNESS:  It was a deep dive.  I assumed
12  you were recalling from memory, but yeah.
13  BY ATTORNEY JENKINS:
14       Q    When I say "deep dig"?
15       A    Yeah.
16       Q    Deep dive, I stand corrected.
17            Let's take that down and mark as Exhibit 16,
18  document 13.  This is an chain of heavily -- or heavily
19  redacted e-mail chain, WMSG 00614 through 619.
20            And let me ask you, Mr. Millers,
21  preliminarily, what -- what was the basis for the
22  redactions in Exhibit 16?
23            (Exhibit 16 marked.)
24            ATTORNEY MITCHELL:  Attorney-client
25  communications.
```

JAMES ROBERTSON

March 26, 2021

1          ATTORNEY JENKINS:  And correct me if I'm

2    wrong, I have not seen any sort of redaction log.

3          ATTORNEY MITCHELL:  I think we produced a

4    privilege log.  I'm not sure we produced a redaction

5    log.  I don't know if that's typical practice.

6          (Reporter clarification.)

7          ATTORNEY MITCHELL:  Oh, I'm sorry.  I said I'm

8    not sure.  I know we produced a privilege log for

9    documents that were fully withheld.  With respect to

10   ones that are redacted, it's basically the information

11   that would be on a redaction log.  It's present, because

12   you see the "to/froms" and the dates and the subject

13   which would be the elements of the redaction log anyway.

14   So if you'd like us to, I guess, identify them, they're

15   attorney-client privileged communications.

16         ATTORNEY JENKINS:  Can we go to the page

17   Bates-labeled 616.

18         Maybe scroll up just a hair.

19         Down just a notch so we can -- I -- I want to

20   see the top of 616.  Perfect.  Perfect.

21   BY ATTORNEY JENKINS:

22   Q     This is an e-mail from you to Mr. Dylan, dated

23   February 4, 2019; correct?

24   **A     Correct.**

25   Q     And you write, "We began the investigation

JAMES ROBERTSON

March 26, 2021

1    into Jeff Bezos on September 9."

2           Is that intended to refer to September 9,

3    2018?

4      **A    Yes.**

5      Q    You write, "My assigning e-mail to the

6    reporter is attached and date-stamped below."

7           Is it your recollection that you attached your

8    assigning e-mail to this e-mail?

9      **A    I would expect so, based on my comment.**

10     Q    Let's scroll down to 617, then.

11          We have here an e-mail from you sent on

12   September 9 -- Sunday, September 9th, 2018, to

13   Ralph Ortega, Andy Tillett, and Michael Hammer.  Are

14   those individuals AMI reporters?

15     **A    Yes.**

16     Q    I'm sorry.  A better question would be, were

17   they AMI reporters at the time?

18     **A    Yes.**

19     Q    And you write, "I want a deep dive profile on

20   Jeff Bezos, with an Enquirer edge for detail."

21          So did AMI perform such a deep dive

22   investigation on Mr. Bezos?

23     **A    The assigned reporter, Ralph Ortega, did begin**

24   **reporting as outlined in this assignment, yes.**

25     Q    And other AMI personnel were also involved in

JAMES ROBERTSON

March 26, 2021

1    that deep dive investigation; correct?

**2**       A    **That's correct.**

3       ATTORNEY JENKINS:  Let's pull up -- take that

4    down and replace it with document 15, which we will mark

5    as Exhibit 17.

6       (Exhibit 17 marked.)

7   BY ATTORNEY JENKINS:

8      Q   This is a message dated 9 -- September 10,

9    2018, from Nik Hatziefstathiou,

10   H-a-t-z-i-e-f-s-t-a-t-h-i-o-u.  And Nik is N-i-k.

11       Mr. Robertson, is this the individual that we

12   previously designated "Nik the Hat"?

**13**      A    **Yes, it is.**

14      Q   Okay.

15       And he was an AMI reporter?

**16**      A    **Yes, he was.  A national correspondent.**

17      Q   And he was involved in the -- the Bezos

18   investigation?

**19**      A    **Yes.**

20      Q   Let's scroll down.  Let's go to 1951.

21       This is an e-mail from Nik the Hat, dated

22   September 10th, 2018, to you and various others.  And

23   you see where he identifies Jeff Bezos's aunt as a

24   source of information?

**25**      A    **Yes, I do.**

JAMES ROBERTSON

March 26, 2021

```
 1        Q    And he names her, Kathy Jorgensen.  Kathy with

 2   a K?

 3        A    Yes.

 4        Q    And keep scrolling down a little bit more.

 5             You see a long list of factual information

 6   that Nik the Hat has provided?

 7        A    Yes, I do.

 8        Q    And his source for that information was

 9   Ms. Jorgensen; correct?

10        A    As represented by Nik here, yes.  I believe

11   that to be true, yes.

12        Q    And you previously indicated you knew that

13   Ms. -- that Nik the Hat had submitted a FOIA request

14   regarding Mr. Bezos on or about August 24th, 2018?

15        A    I am aware, but I do not recall to which

16   agency or for what purpose.

17        Q    Okay.  So it's fair to say that Nik the Hat

18   was investigating Mr. Bezos weeks prior to your

19   September 9, 2018, e-mail that we viewed previously?

20        A    I wouldn't use the word "investigate," as

21   Nik -- Nik's primary responsibility as a national

22   correspondent was to submit FOIA requests.  He maintains

23   a designated in-box to submit them for all parties and

24   people, all agencies, and relevant subjects.

25        Q    And so, essentially, all he does is submit --
```

JAMES ROBERTSON

March 26, 2021

```
 1                ATTORNEY JENKINS:  Let's take that down and
 2   put up document 18, which will be Exhibit 19.
 3                (Exhibit 19 marked.)
 4   BY ATTORNEY JENKINS:
 5        Q    It's a two-page e-mail commencing WMSG 305.
 6   Can we go straight to the bottom of the second page.
 7                And also on October 11th, 2018, Mr. Howard
 8   responds to Ms. Simpson, 7:47 a.m.  Do you see where I
 9   am, sir?
10        A    Yes, I do.
11        Q    Okay.  And he writes to her, "Would we not put
12   on a tail on Bezos from today?"
13                Did I read that correctly?
14        A    Yes, you did.
15        Q    And then going up two exchanges on the same
16   day, at 11:13 a.m., Mr. Howard again writes Ms. Simpson,
17   "I think we do it covertly.  Michael will never know --
18   unless you talk to him."
19                That much was accurate; correct?
20        A    Tell him.  But, yes, that's accurate.
21        Q    And that afternoon, 2:17 p.m., Ms. Simpson
22   writes back:
23                "I won't tell him.
24                "Besides, you're my boss so if you
25                tell me to do something, I have to follow
```

JAMES ROBERTSON

```
 1              through."

 2              That's what Ms. Simpson wrote; correct?

 3       A      Correct.

 4              ATTORNEY JENKINS:  Document 19 will be

 5   Exhibit 20 -- wait.  Why did everybody suddenly shrink?

 6              ATTORNEY MITCHELL:  Jonathan, if this going to

 7   be a long one, can we take a break?  Tell me.

 8              ATTORNEY JENKINS:  This -- this will be short,

 9   but if you want to take a break, you're welcome to.

10              ATTORNEY MITCHELL:  How are you feeling?

11              THE WITNESS:  I'm okay.

12              ATTORNEY MITCHELL:  Good.  One more document,

13   and then let's take a break.  Okay?

14              ATTORNEY JENKINS:  So Exhibit 19 is a

15   three-page --

16              THE AUDIOVISUAL TECHNICIAN:  Excuse me.  This

17   is Exhibit 20; correct?  Document 19?

18              ATTORNEY MITCHELL:  20.

19              ATTORNEY JENKINS:  Yeah, thank you.  Thank

20   you.  I -- document 20 -- document 19, Exhibit 20.

21   Thank you.

22              (Exhibit 20 marked.)

23   BY ATTORNEY JENKINS:

24       Q      Let's go to the last page.  There we go.

25              Can you see that this is a -- an e-mail from
```

```
1    Ms. Simpson dated ele -- October 11th, 2018, at
2    3:00 p.m. to Mr. Howard, to you, and to Richard White,
3    whose e-mail address is rwhite@radaronline.com.
4           You recognize this document, sir?
5       A   Yes, I do.
6       Q   All right.  Who is Richard White?
7       A   Richard White is the head of photo of AMI.
8       Q   Just out of curiosity, why is his e-mail
9    address "Radar Online"?
10      A   Some various staff members have different
11   subsequent domains.  If you were to e-mail
12   rwhite@amilink.com, it would also go to Richard.  If you
13   were to email Richard at rwhite@nationalenquirer.com, it
14   would also receive to Richard.  That e-mail will just be
15   how Andrea has him saved in her contact book.  That --
16   that e-mail will be the one that she has saved.
17      Q   Okay.  And that -- that's because individuals
18   such -- including Ms. Simpson, who also has "Radar
19   Online" here, frequently work for both "Radar Online"
20   and the "National Enquirer" at the time, I should say?
21      A   That's correct.
22      Q   And you see here where Ms. Simpson is
23   explaining that -- about the middle of the e-mail --
24   "Dylan wants to tail Bezos starting today."
25          And then going up, Richard White, the head of
```

JAMES ROBERTSON

March 26, 2021

```
 1   photo says, "On it."
 2            You see where that is?
 3       A    Yes.
 4       Q    Okay.
 5            And so that very same day, on October 11th,
 6   AMI, at least, undertook efforts to put Mr. Bezos under
 7   surveillance; correct?
 8       A    Sur -- "surveillance" is a sensational word,
 9   but we attempted to get photography of Mr. Bezos.
10       Q    And without Mr. Sanchez's knowledge; correct?
11       A    It would appear that's the case, yes.
12            ATTORNEY JENKINS:  Nicole --
13            ATTORNEY MITCHELL:  If you're moving on, I'd
14   like to take a quick break, Jonathan.
15            ATTORNEY JENKINS:  Oh, yes.  That's right.
16            (Pause in the proceedings.)
17            ATTORNEY JENKINS:  Let's -- Nicole, could
18   you -- let's see what happens when we put up a native
19   file.  Let's put up 25.  And that will be Exhibit 21.
20            (Exhibit 21 marked.)
21            ATTORNEY JENKINS:  Which I will note in the
22   file name of the document, assuming it works, and e-mail
23   you an electronic copy for inclusion in the transcript.
24            Okay.  Good.  All right.  This works a lot
25   better than the pdf version which came out very, very
```

JAMES ROBERTSON

March 26, 2021

```
 1      A    As I said, he provided off-record personal
 2   background to Jeff's life to an "Us Weekly" reporter.
 3      Q    Oh, "Us Weekly."  Okay.  Great.
 4           And "Us Weekly" is an A -- or was an -- right
 5   at the time was an AMI publication?
 6      A    It was, yes.
 7      Q    Okay.  Okay.  So let's take that one down.
 8           Do I have to give something to give control
 9   back to you, Nicole?
10           THE AUDIOVISUAL TECHNICIAN:  I have control.
11           ATTORNEY JENKINS:  Can we put up document 20,
12   should be Exhibit 22.  And can we go -- it's fairly
13   long.
14           ATTORNEY MITCHELL:  That's an understatement.
15           ATTORNEY JENKINS:  Can we go to WMSG 209.
16           (Exhibit 22 marked.)
17           ATTORNEY JENKINS:  A little bit lower.
18   Por favor.  Okay.  Right there.
19   BY ATTORNEY JENKINS:
20      Q    Mr. Robertson, this appears to be another
21   extract of text messages between various people.  It
22   appears at the very bottom of WMSG 209.  There is start
23   of a text message sent by Ms. Simpson.  Actually,
24   it's -- it's unclear to me whether these are text or
25   e-mail communications, 'cause I see e-mail addresses.
```

JAMES ROBERTSON

```
 1              Mr. Mitchell can you shed any light?
 2              ATTORNEY MITCHELL:  I think -- well, I think
 3    Mr. Robertson can probably shed more light than I can.
 4              THE WITNESS:  Yeah.  This is Andrea Simpson
 5    putting e-mails into a text document.  I -- I wouldn't
 6    use "BTW" in a text message.  I would have written "by
 7    the way."  But I would have done some flippantly in an
 8    e-mail.
 9    BY ATTORNEY JENKINS:
10         Q    Okay.  So --
11         A    Pasted e-mails into a text document.
12         Q    Got it.  And -- and you know that she did this
13    how?
14         A    I assume with copy and paste.
15         Q    Did you assign her to do this?
16         A    I don't recall.
17         Q    I'm sorry?
18         A    I don't -- I don't recall.
19         Q    Do you have any reason to believe that this is
20    not a accurate and correct assembly of e-mail messages
21    put together by Ms. Simpson?
22         A    The likelihood is they're accurate, but I
23    would not say so with complete certainty due to the
24    nature of copying and pasting and self-organization.
25              ATTORNEY JENKINS:  Well, Mr. Mitchell, I
```

JAMES ROBERTSON

1    couldn't find a lot of these communications in the
2    actual e-mail production.  Are you willing to stipulate
3    to the authenticity of these extracts?
4            ATTORNEY MITCHELL:  To the degree -- and,
5    look, Mr. Jenkins, I understand this to be a -- an
6    effort to put together various texts and e-mail
7    compositions that involve Ms. Simpson.  I'm not sure I
8    can stipulate 100 percent to the accuracy --
9            (Reporter clarification.)
10           ATTORNEY MITCHELL:  My understanding is that
11   this is a timeline prepared by Ms. Simpson that contains
12   both text and e-mails that she was involved in that she
13   put together.  I have no reason to believe that they're
14   not accurate.  I -- I think most of them are produced in
15   various different forms.  Some of them may not be
16   produced because they're not -- the -- maybe they didn't
17   exist.  I just don't know they exist at this point.
18           But I have no reason to believe they're not
19   accurate.  And so I guess I can stipulate that they are
20   accurate to the knowledge of the company subject to
21   determining that, as Mr. Robertson may have mentioned,
22   you know, there's a mistake in the copy and paste or
23   something like that.  That's about as far as I can go.
24           ATTORNEY JENKINS:  So you can --
25           ATTORNEY MITCHELL:  In other words, please --

JAMES ROBERTSON

```
 1   you -- you can use them and -- and presume their

 2   accuracy subject to us determining that there's either a

 3   word mistake or some other problem.

 4           ATTORNEY JENKINS:  Okay.  Well, I'll go with

 5   that then.

 6           ATTORNEY MITCHELL:  Okay.

 7   BY ATTORNEY JENKINS:

 8       Q   So going back to the bottom of 209, what

 9   appears to be an e-mail from Ms. Simpson on

10   November 9th, 2018, at 10:07 p.m., that starts and

11   carries over to the top of the next page, "Lauren is

12   flying from Cabo to Burbank (Burbank or Santa Monica) on

13   the WME plane."

14           Did I get that sentence correct?

15       A   Yes, you did.

16       Q   And WME is William Morris Endeavor?

17       A   That's correct.

18       Q   And Mr. Whitesell is the --

19       A   Co-CEO.

20       Q   Thank you.

21           ATTORNEY MITCHELL:  Mr. -- Mr. Jenkins, let me

22   add one other point.  With respect to many of the ones

23   that you probably didn't find in our production are

24   because we -- they're outside the scope of the Judge's

25   order.  But we just didn't bother to remove them --
```

JAMES ROBERTSON

```
 1   (buffering) document.

 2              (Reporter clarification.)

 3              ATTORNEY MITCHELL:  I'll go over here.

 4              Many of them -- many of the materials that are

 5   in the timeline that you don't see as exhibits elsewhere

 6   or as produced documents, it's 'cause they were outside

 7   the scope of the Judge's order.  But since this was a

 8   single document, we elected to just produce the document

 9   in toto.

10              ATTORNEY JENKINS:  Okay.

11              ATTORNEY MITCHELL:  There you go.  I got some

12   information to clarify that, and I wanted to make sure

13   you got that.

14              ATTORNEY JENKINS:  I -- I appreciate that,

15   Counsel.

16              ATTORNEY MITCHELL:  Okay.

17   BY ATTORNEY JENKINS:

18      Q    So then top of the next page, Ms. Simpson goes

19   on:

20                   "Jeff is flying to Burbank (most

21                   likely from Texas) where he is getting an

22                   award.  Lauren was going to travel to

23                   Texas for the ceremony for purposes of

24                   the documentary, but they both decided it

25                   wasn't a good idea.
```

```
 1                    Madam Reporter, what's our next exhibit
 2       number?
 3                    THE AUDIOVISUAL TECHNICIAN:  It's 23.  This is
 4       Nicole.
 5                    ATTORNEY JENKINS:  Thank you, Nicole.  And
 6       could you -- is it possible for me to get control for
 7       scrolling purposes.
 8                    THE AUDIOVISUAL TECHNICIAN:  There you go.
 9                    ATTORNEY JENKINS:  Thank you.
10                    (Exhibit 23 marked.)
11       BY ATTORNEY JENKINS:
12            Q    Okay.  Mr. Robertson, this is another native
13       spreadsheet extracting what appear to be iPhone texts.
14       It appears to me that these extractions are from
15       Mr. Howard's iPhone.
16                    And there's only one entry in the from column,
17       which is ██████████, which is followed by DP.  Does
18       that indicate to you that that is a text sent by
19       Mr. Pecker?
20            A    I don't know Mr. Pecker's number from memory,
21       but it would be fair to assume that those initials would
22       be his.
23            Q    Who is David Pecker?
24            A    He is the chairman and CEO of American Media,
25       AMI.
```

JAMES ROBERTSON

March 26, 2021

1       Q    Okay.  So he -- he was the top person at AMI?

**2       A    That's correct.**

3       Q    And there's not much of an indication as to

4    whom he is texting with except for the fact that the

5    source of the information was off of Dylan's iPhone or

6    Dylan Howard.  Is it fair that -- to presume that this

7    is a text series between Mr. Howard and Mr. Pecker?

**8       A    Yes, that would be fair to assume.**

9       Q    Okay.

10           So on 10/19 -- or October 19th, 2018,

11   Mr. Pecker -- excuse me -- Mr. Howard writes, "We nailed

12   Bezos last night.  Tracked his private jet and he's with

13   her."

14           So is it fair to assume that on October 19th,

15   2018, Mr. Howard sent that text to Mr. Pecker?

**16       A    That would be fair to assume, yes.**

17       Q    Okay.  And then UTC 4 and UTC 4, UTC 4, so it

18   appears safe to assume that they were both in the same

19   time zone.  So it appears that roughly seven minutes

20   later on the same day --

21           ATTORNEY MITCHELL:  Objecting to that.  I'm

22   not sure that's accurate.

23           But go ahead and ask your question.

24           ATTORNEY JENKINS:  How -- how is it

25   inaccurate --

```
 1              ATTORNEY MITCHELL:  Well, I'm not sure UTC
 2    means they're in the same time zone.  But maybe it does.
 3    Okay.  I guess -- I guess it's something someone can
 4    research, but okay.
 5    BY ATTORNEY JENKINS:
 6        Q    Okay.  So Mr. Pecker replies, "Wow."  Does
 7    that appear to be an indication that Mr. Pecker was at
 8    least somewhat impressed by the -- this revelation?
 9              ATTORNEY MITCHELL:  Objection.  Calls for
10    speculation.  It says what it says.
11              You can answer if you --
12              THE WITNESS:  I -- I would have the same
13    assumption as anyone else looking at that text message,
14    that it would mean a good thing.
15    BY ATTORNEY JENKINS:
16        Q    And then it appears at approximately
17    one minute later Mr. Howard responds:
18                   "We did independent of the source too
19                   based on our investigation.  Still
20                   meeting the source on Monday as he has
21                   corroborating proof of the affair itself.
22                   But it's all progressed."
23        Q    Do you have an understanding as to who is
24    being referred to as "the source"?
25        A    Michael Sanchez.
```

1           developed the capacity to track

2           Mr. Bezos's plane independent of any

3           information provided by Mr. Sanchez?")

4           **THE WITNESS:  Sorry, Mr. Jenkins, is my answer**

5    **not sufficient?**

6    BY ATTORNEY JENKINS:

7        Q    I'm not completely understanding it.

8             At this point in time, October 19th, 2018,

9    Mr. Sanchez had not yet disclosed to AMI the identity of

10   the billionaire; correct?

11       **A    He had given enough information that gave**

12   **Dylan and Andrea comfort that it was worth tailing**

13   **Mr. Bezos in the extreme likelihood, based on the images**

14   **that Mr. Sanchez had presented, that he was the subject**

15   **of the story Michael was trying to broker or sell.  And**

16   **off that information alone did we obtain photographs.**

17            **But the photographs themselves did not**

18   **constitute to proof of an affair.  The affair**

19   **information was all from Mr. Sanchez, and it was his**

20   **information that ultimately led us to obtain these**

21   **photographs.  And it was not independent of him or any**

22   **of the September 9 assignment reporting.**

23            (Reporter clarification.)

24   BY ATTORNEY JENKINS:

25       Q    So you recall a previous discussion about how

1    Mr. Howard had directed AMI people to put a tail on

2    Mr. Bezos; right?

3        **A    To the extent of the exhibit that you showed.**

4        Q    Right.  So AMI did, in fact, put a tail on

5    Mr. Bezos subsequently; correct?

6        **A    Correct.  Correct.**

7        Q    Okay.

8             And who was it that conducted the tail?  I

9    think you may have said but --

10       **A    It was an agency called The Image Direct.**

11       Q    Got it.  Okay.

12            And so by October 19th, 2018, AMI had

13   successfully acquired a tail on Mr. Bezos and was

14   independently of Mr. Sanchez tracking Mr. Bezos's

15   private jet?

16            ATTORNEY MITCHELL:  Objection.

17            **THE WITNESS:  Correct.  But the reference to**

18   **the images that are the point of this description are**

19   **meaningless without Mr. Sanchez's full cooperation as**

20   **they merely showed a group of people ex -- exiting a**

21   **private jet, which included Mr. Bezos and Ms. Sanchez.**

22   **But standing alone without Mr. Sanchez would have meant**

23   **nothing to the "National Enquirer" and would not have**

24   **led us to do anything beyond stating that they were on a**

25   **private jet with other passengers.**

JAMES ROBERTSON

```
 1    BY ATTORNEY JENKINS:

 2         Q    Understood.  No.  I just wanted to confirm

 3    that by 10/19/2018, AMI was sufficiently certain of its

 4    source that it was -- or excuse me -- of the

 5    billionaire's identity that it was actively tailing him

 6    and tracking his private jet.  But I think we've

 7    accomplished that.

 8              Give me -- Counsel, give me five minutes.  I

 9    think I may be done, but I just want to review my notes.

10              ATTORNEY MITCHELL:  You got it.

11              ATTORNEY JENKINS:  Thank you.

12              (Pause in the proceedings.)

13              ATTORNEY JENKINS:  Back on the record.

14              Thank you for your time, Mr. Robertson.  I

15    have concluded my questioning, at least for purposes of

16    the limited discovery ordered by the Court.

17              ATTORNEY MITCHELL:  We -- we should put on the

18    record, with the court reporter, to the degree testimony

19    was held today that relates to documents that have been

20    marked confidential and/or subject to the protective

21    order, those segments of testimony themselves must be

22    treated confidential.  And what we've done as of

23    yesterday's deposition was, frankly, to have, I guess

24    transcripts of today sent to both counsel so that they

25    can, perhaps, confer and agree on what parts of the
```

```
 1   transcripts should be treated as confidential.
 2              ATTORNEY JENKINS:  Yeah.  I mean, there
 3   was . . .
 4              ATTORNEY MITCHELL:  I couldn't hear you, sir.
 5              ATTORNEY JENKINS:  There was information
 6   unrelated to documents regarding sourcing and that sort
 7   of thing that should probably remain confidential so --
 8              ATTORNEY MITCHELL:  Right.  Anything -- I
 9   think we should both look at the record and -- and
10   determine, beyond that, if there's other stuff as well.
11   And we'll just sort of -- I don't think it's going to be
12   particularly difficult to agree, what's ever
13   confidential is confidential.  But let's make sure we
14   both, you know, see the transcript and perhaps exchange,
15   you know, marked-off areas, you know.
16              ATTORNEY JENKINS:  Fair enough.
17              THE REPORTER:  Are we off the record?
18              ATTORNEY JENKINS:  We're off the record.
19              (The deposition concluded at 4:08 p.m.)
20
21
22
23
24
25
```

JAMES ROBERTSON

March 26, 2021

```
 1              REPORTER'S CERTIFICATION

 2

 3         I, Kyung Lee-Green, Certified Shorthand Reporter,

 4    in and for the State of California, do hereby certify:

 5         That the foregoing witness was by me duly sworn;

 6    that the deposition was then taken before me at the time

 7    and place herein set forth; that the testimony and

 8    proceedings were reported stenographically by me and

 9    later transcribed into typewriting under my direction;

10    that the foregoing is a true and correct record of the

11    testimony and proceedings taken at that time;

12         That before completion of the deposition, review of

13    the transcript (  ) was (  ) was not requested;

14    (  ) that the witness has failed or refused to approve

15    the transcript.

16         I further certify that I am not an attorney or

17    counsel of any parties, nor am I a relative or employee

18    of any attorney or counsel of the party connected with

19    the action, nor am I financially interested in the

20    action.

21         IN WITNESS WHEREOF, I have subscribed my name this

22    8th day of April, 2021.

23         _____

24                    Kyung Lee-Green

25         Certified Shorthand Reporter No. 12655, CLR
```